S.O.G. OF ARKANSAS

v.

The UNITED STATES.

No. 4–75.

United States Court of Claims.

Dec. 15, 1976.

Thomas M. Phillips, Houston, Tex., attorney of record, and Ronald L. Palmer, Houston, Tex., for plaintiff. Baker & Botts, Houston, Tex., of counsel.

Raymond B. Benzinger, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before COWEN, Chief Judge, and DAVIS and BENNETT, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This contract case, before us under the Wunderlich Act, 41 U.S.C. §§ 321–22, arose from plaintiff S.O.G. of Arkansas' agreement to construct Lock and Dam No. 4 on the Arkansas River. The project, one unit of a system of seventeen locks and dams, was designed to help provide a navigable channel from the Mississippi River to Catoosa, Oklahoma. S.O.G. a joint venture formed to obtain and perform the contract, responded to a Corps of Engineers' invitation for bid (IFB) issued in October 1974. The Government's bid documents included a schematic diagram of cofferdams to be constructed of steel sheet piling cells in the river areas and embankment dikes on the existing river banks. This plan unmistakably indicated that the cofferdams were to be built within the existing river banks, and that the purpose was to permit, first, one-half of the lock and dam construction to be built "in the dry," and then the other half. On the face of the diagram was a notation stating that the diagram was "schematic and for the purpose of estimating only." Accompanying the diagram were detailed specifications that outlined various requirements that the contractor had to meet during the two stages of river diversion and construction. The notation on the diagram also stated that "[d]esign of the diversion scheme will be in accordance with the applicable provisions of the specifications."

S.O.G. and its engineering consulting firm reviewed the plans and specifications and devised what they considered to be the best plan for diverting the river during construction. S.O.G.'s scheme diverted the river beyond its banks onto its flood plain, so that the entire river bed would be dry at one time and the lock and dam could be built in one continuous effort; unlike the plan indicated on the Government's diagram, S.O.G.'s arrangement did not confine the diversion within the natural channel of the river, nor did it provide that part of the river would at all times be flowing in its normal channel.[1] S.O.G. says that it based its bid on its own plan, believing that the diagram provided in the bid documents was in no way mandatory and that plaintiff's plan was feasible, economical and in compliance with a reasonable interpretation of the plans and specifications.

After the Government awarded the contract to S.O.G., plaintiff submitted its diversion plan for the Corps' approval. The Government thoroughly considered S.O.G.'s plan over a period of three weeks. Al-

---

1. Also, S.O.G., proposed a single earthen cofferdam, not two steel cofferdams. Plaintiff's brief (pp. 3–4) says that the Engineers' plan "was much more expensive to implement than the S.O.G. Diversion Plan. Specifically, it required diverting the Arkansas River in two steps utilizing two successive cofferdams and building the permanent structures in two separate steps rather than one continuous operation as contemplated by the S.O.G. Plan. Also, the Plan depicted on the [IFB] Drawing showed the use of steel sheet piling in the two cofferdams as opposed to the earthen cofferdam that S.O.G. anticipated using."

though subordinates of the contracting officer thought that the plan could be implemented if a number of modifications were made, the contracting officer eventually rejected it on the ground that it did not comply with the contract specifications. S.O.G. was thereafter required to implement the river diversion plan depicted on the contract diagram, causing plaintiff (it asserts) to incur $2,000,000 in additional expenses.

S.O.G. contends that the Government's diagram was in no way binding since it was designated as "schematic and for the purpose of estimating only." As for the specifications, they were thought to be merely general criteria establishing end-performance standards; accordingly, plaintiff says it was free to design completely the river diversion scheme as long as its plan followed sound engineering and construction practices and accomplished the Government's essential end-objectives. To support its position, S.O.G. relies on several paragraphs of the specifications concerning the contractor's design responsibilities and holding the contractor liable for the success of the diversion plan. The Government, however, urges that the diagram and specifications clearly called for the use of cofferdams and a two-stage diversion and construction scheme within the river banks. While the contractor was to have certain design responsibilities (and accompanying liability for a design failure), the Government asserts that the contract documents did not give S.O.G. the right to disregard the Government's basic river diversion plan and substitute a very different one which was admittedly not confined within the river's banks. The Government therefore asserts that it properly rejected S.O.G.'s diversion plan and insisted on its own.[2]

In order to resolve this dispute, we need not agree with either party's interpretation of the contract. The case presents another example of a contractor who, faced with a patent ambiguity in Government bid documents, did not meet his responsibility to have the ambiguity resolved before bidding. *See, e.g., Space Corp. v. United States,* 470 F.2d 536, 538–39, 200 Ct.Cl. 1, 5–6 (1972); *Jamsar, Inc. v. United States,* 442 F.2d 930, 934, 194 Ct.Cl. 819, 827 (1971); *Woodcrest Constr. Co. v. United States,* 408 F.2d 406, 412–13, 187 Ct.Cl. 249, 260, *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); *J. A. Jones Constr. Co. v. United States,* 395 F.2d 783, 789–90, 184 Ct.Cl. 1, 12–13 (1968); *Blount Bros. Constr. Co. v. United States,* 346 F.2d 962, 972–73, 171 Ct.Cl. 478, 496 (1965); *Beacon Constr. Co. of Mass. v. United States,* 314 F.2d 501, 503–04, 161 Ct.Cl. 1, 6–7 (1963). We therefore confirm the decision of the Corps of Engineers Board of Contract Appeals without having to decide, as the Board did, whether the Government's interpretation of the contract was the only, or clearly the more, reasonable one.

From the contractor's point of view, there was obviously a patent ambiguity in the IFB documents. Plaintiff itself says in its reply brief (p. 2) that an "important and salient point" is that "the contract documents in this case are subject to at least two reasonable interpretations; the one made by S.O.G. in proposing its Diversion Plan (which is the basis of its claim for equitable adjustment) and the one argued for by the Government in its Brief (which the Government contends is the only reasonable interpretation)." There is no doubt that the bid documents contain significant expressions favoring each side. On the one hand, the defendant can point to the contract diagram which was utterly irreconcilable with plaintiff's scheme. If the diagram itself could be entirely disregarded (because of the legend that it was "sche-

**2.** The Government's position is supported, at least to some extent, by *S. S. Mullen, Inc. and Dravo Corp.,* Eng. BCA No. 3241 (7 April 1972), *aff'd sub nom. S. S. Mullen, Inc. & Dravo Corp., d/b/a Juneau Dam Constructors,* 203 Ct.Cl. 750 (1974). In that case the Board held that a schematic drawing which showed an access road on one side of a river could not be interpreted to allow the contractor to build the road on the river's other side even though the specifications stated that the alignment shown on the diagram was schematic and that the contractor was responsible for determining alignment and road design.

matic" and "for the purpose of estimation only") then there were specific parts of the specifications which appeared to implement the general plan of the diagram and were very hard to harmonize with plaintiff's position.[3] On the other hand, plaintiff relies primarily on the diagram's legend and the absence of any statement that the diagram plan was mandatory; on the references in the specifications to the contractor's responsibility for the "design" of cofferdam and dewatering "systems" as well as to the contractor's "proposed diversion plan"; and on the explicit and unqualified statement that the contractor would be responsible "for the adequacy of the plan."

We cannot escape the conclusion that a knowledgeable bidder, as S.O.G. admittedly was, should have recognized at once that there would be a grave problem as to whether its proposed diversion plan conformed with the IFB. Those documents appeared on their very surface to be internally inconsistent on the important point of the diversion plan; the contradiction was not subtle, hidden, or minor but patent, blatant, and significant. Indeed, the record suggests that S.O.G. was in fact aware of the problem. After bid opening but before the award, representatives of the plaintiff met to discuss the diversion and considered alternate plans, including the Corps' two-stage within-banks plan as depicted on the diagram, which admittedly was much more expensive than the plan S.O.G. ultimately submitted. It was anticipated that the Corps might reject the plaintiff's own plan. And at the conference (after award) at which the contracting officer definitely rejected plaintiff's scheme, its principal officer agreed that he had taken a calculated risk in submitting his proposed plan.

Rather than ask for clarification, and despite the warning given it by the bid documents, S.O.G. ignored the conflict inherent in these documents and assumed the right to disregard the diagram and those parts of the specifications that would appear to limit its freedom of design. The extra expenses which S.O.G. now claims may well have been covered if, prior to bidding, S.O.G., had acted to clarify its responsibilities under the contract. If it had inquired and discovered what the Government wanted it may not have bid on the project or, if it decided to bid, it may have been able to tailor more advantageously its design and the concomitant costs. S.O.G. acted without seeking to resolve this patent ambiguity, and while the plan it submitted may have been as reasonable as the one proposed by the Government, under the circumstances the latter had the right to reject a scheme not in accordance with its conception of the project.

■ The rule that a contractor, before bidding, should attempt to have the Government resolve a patent ambiguity in the contract's terms is a major device of preventive hygiene; it is designed to avoid

---

**3.** Paragraph 1–02 ("Diversion Structures") provided: "* * * Construction of the cofferdams *within the river banks* shall not commence until the *protective left bank revetment* has been completed. Except for those portions of the cofferdams *on the existing river banks* which may be embankment dikes, cofferdams enclosing the work area shall be constructed of new or used interconnected steel sheet piling cells * * *. *Stage construction of cofferdams* shall be so laid out and scheduled that *at all times during the first stage and any intermediate stages of diversion* there will be a minimum clear river opening of 550 feet at elevation 189.0. *The completed lock and the first seven completed spillway bays shall be available for river flow during the last stage of river diversion* * * *." (Emphasis added.)

Paragraph 1–03 ("Design Data") provided that "The plan for diversion of the river flow * * * has been prepared by the Government for the use of the contractor and is shown on the drawings," and expressly refers to two stages of cofferdam construction and to "upstream" and "downstream" portions. Paragraph 1–04 ("Submission of Plan of Diversion for Approval") required the contractor to submit a diversion plan (after notice to proceed) which, among several other things, would give the "details of the tie-in between Stage II cofferdam and permanent construction." Paragraph 1–11 ("Removal of Cofferdam") declared: "Stage I cofferdam shall be removed concurrently with construction of Stage II cofferdam and shall be completely removed prior to or upon completion of Stage II cofferdam * * *. After Stage II cofferdam has served its purpose, it shall be removed as required."

just such post-award disputes as this by encouraging contractors to seek clarification before anyone is legally bound. The rule is the counterpart of the canon in government procurement that an ambiguous contract, where the ambiguity is not open or glaring, is read against the Government (if it is the author). *See Sturm v. United States,* 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970). Both rules have their place and their function. In addition to its role in obviating unnecessary disputes, the patent-ambiguity principle advances the goal of informed bidding and works toward putting all the bidders on an equal plane of understanding so that the bids are more likely to be truly comparable. Conversely, the principle also tends to deter a bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid (based on the less costly reading) with the expectation that he will then be able to cry "change" or "extra" if the procuring officials take the other view after the contract is made.

For these reasons, plaintiff's motion for summary judgment is denied and the defendant's motion is granted. The petition is dismissed.