**BROMLEY CONTRACTING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 443–84C.

United States Claims Court.

Dec. 8, 1987.

Martin J. Cohen, New York City, for plaintiff.

Frank B. Flink, Jr., Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

Plaintiff, Bromley Contracting Co., Inc., motioned for summary judgment under Wunderlich Act review of two decisions of the Department of Transportation Board of Contract Appeals (Board). Defendant argued that plaintiff failed to show that the Board's decisions were arbitrary, capricious, unsupported by substantial evidence, or otherwise not in accordance with applicable law, and moved to dismiss the complaint. Jurisdiction lies in this court pursuant to the Wunderlich Act, 41 U.S.C. §§ 321–322 (1976), because plaintiff's cause of action was a pre-Contract Disputes Act proceeding. *E.g.*, *Opalack v. United States*, 5 Cl.Ct. 349 (1984).

## FACTS

On June 30, 1975, the United States Coast Guard awarded contract number DOT–CG03–6287 to plaintiff, the lowest bidder. The contract required plaintiff to repoint and waterproof various portions of the exterior masonry and to renew the windows of various buildings of the Coast Guard's facility at Governor's Island, New York. Disputes arose over the scope of work contemplated and performed in the contract, the appropriate categorization of work as restorative or protective, and over the payment due the contractor under each category. Plaintiff appealed an adverse decision of the contracting officer on these

issues to the Board. The Board issued an opinion on entitlement and remanded the matter to the parties to negotiate quantum. *Bromley Contracting Co.*, 1981–2 B.C.A. (CCH) ¶ 15,191 (1981) (*Bromley I*). When settlement negotiations failed, plaintiff requested a final decision on quantum from the contracting officer. Plaintiff appealed the contracting officer's decision on quantum to the Board. The Board ruled, *Bromley Contracting Co.*, 1984–2 B.C.A. (CCH) ¶ 17,233 (1984) (*Bromley II*), and plaintiff appealed under the Wunderlich Act to the court.

## DISCUSSION

■■■ The Board made exhaustive and detailed findings of fact in both decisions. Since plaintiff carries the burden of contesting the legal substantiality of the decisions, we will forego recitation of such intricacies as are irrelevant to the challenged findings. Under Wunderlich Act review, administrative findings of fact are conclusive and binding on this court unless the plaintiff can show that the finding of fact is fraudulent, capricious or arbitrary, or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence. *Koppers Co. v. United States*, 186 Ct.Cl. 142, 147, 405 F.2d 554, 557 (1968); 41 U.S.C. § 321 (1982). The substantial evidence test is a reasonable person standard; that is, the *"standard goes to the reasonableness of what the agency did on the basis of the evidence before it."* *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1414, 10 L.Ed. 2d 652 (1963) (emphasis in original). The reasonableness of the Board's action, then, does not turn on whether there was no evidence in the record below to support a finding for plaintiff, but rather whether the Board's finding against plaintiff was substantial under Wunderlich standards. Plaintiff, therefore, carries a heavy burden. In its effort to meet this burden, plaintiff may not resort to *de novo* reargument of the facts and evidence, *Bianchi*, 373 U.S.

at 715, 83 S.Ct. at 1414. It must instead present the Board's conclusions of fact, in light of the evidence used by the Board to reach that conclusion, and show how these conclusions are unsubstantiated by the evidence. On questions of law, this court is not bound by the Board's determinations, though such determinations should be given careful consideration. *Gevyn Constr. Co. v. United States*, 11 Cl.Ct. 203, 205 (1986), *aff'd*, 827 F.2d 752 (Fed.Cir.1987) (citing *Raytheon Co. v. United States*, 2 Cl.Ct. 763, 767 (1983), *aff'd*, 730 F.2d 1470 (Fed.Cir.1984)).

*Set Backs*

■■■ All bidders to this contract based their bids on the work specifications included in the bid package, and on an architect's drawing of some of the work areas. The amount of restoration work to be performed on various buildings was estimated by shaded areas on the drawings. The drawings' companion specifications indicated square footage figures corresponding to the shaded areas. Neither the drawings nor the specifications, however, indicated that the walls contained recesses, or "set backs." Plaintiff claimed before the Board that the "set backs" constituted 11,600 square feet [1] of extra work for which plaintiff should receive additional compensation.

> The Board denied the claim, stating that [plaintiff] should have known about these deviations from the drawings during performance because the work required constant referral to the drawings to determine the shaded areas. By its failure to object to patently defective drawings, [plaintiff] waived its rights to claim compensation for these defects.

*Bromley I*, 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,203 (citing *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 546 F.2d 367 (1976)).

In its appeal to this court plaintiff argued that the Board erred because bidders could do nothing else than bid on the

---

1. Although plaintiff asserts in its brief that all parties, including the Board, agreed that a) 11,- 600 square feet is the appropriate measurement of the "set backs," and b) plaintiff actually restored that amount, plaintiff has cited no reference to support either assertion, and we can find none.

square footing figures listed in the specifications and on those areas actually shown in the shaded drawings. This approach, however, fails to attack the interpretation of law upon which the Board relied in holding against plaintiff. The Board found that plaintiff was required to, and did, in fact, inspect the buildings prior to the award of the contract. Plaintiff did not dispute this finding. The Board also found, as previously noted, that the "set backs" ranged from one to twenty feet deep. Plaintiff, likewise, did not dispute this finding. The discrepancy between the areas shown and those actually observed should have been obvious to any bidder inspecting the buildings before embarking on the contract.

In *S.O.G. v. United States*, 212 Ct.Cl. 125, 546 F.2d 367 (1976), cited by the Board in support of its determination of legal entitlement, government bid documents included a schematic diagram detailing contract requirements for construction of a dam on the Arkansas River. The documents were facially inconsistent with the bidder's interpretation of the scope of the work required under the contract. The contradiction was "patent, blatant, and significant" and the bidder was in fact aware of the problem. The court found that "a knowledgeable bidder ... should have recognized at once that there would be a grave problem" as to whether its understanding of the contract requirements was correct. *S.O.G.*, 212 Ct.Cl. at 130, 546 F.2d at 370. The court upheld the Corps of Engineers Board of Contract Appeals' determination that the "contractor ... faced with a patent ambiguity in Government bid documents, did not meet his responsibility to have the ambiguity resolved before bidding." *S.O.G.*, 212 Ct.Cl. at 128, 546 F.2d at 369. This responsibility deters "a bidder who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid ... with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials take the other view after the contract is made." *S.O.G.*, 212 Ct.Cl. at 131, 546 F.2d at 371.

While not directly contesting the application of this standard to itself, plaintiff asserted that none of the other bidders questioned the drawings. From this assertion plaintiff might have been expected to develop an argument that the drawings were not patently defective. However, plaintiff's assertion stands alone, unaided by any other showing that the Board's conclusion is unsupported by the record, and does nothing to weaken the application of the cited law. Instead, plaintiff disputed that it was responsible to object to so obvious a discrepancy between drawing and building "during performance," as the language of the Board's decision places that responsibility in time. *Bromley I*, 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,203.

We feel that the Board's statement of the appropriate time for objection was in error, but that the error was harmless. The case law cited by the Board as described in this opinion clearly places an obligation on the contractor to clarify obvious ambiguities before the award, rather than during performance, of the contract. Even so, the wording of the Board's decision favored rather than harmed plaintiff since it appears to allow an even wider window of time to clarify a contract's requirements. Even if the correct rule of law had been applied, the record establishes, and goes unchallenged by plaintiff, that plaintiff performed a pre-award visual inspection of the site and accepted the contract award without reservation. We conclude, therefore, that the Board correctly determined that the plaintiff knew or should have known of the discrepancy between the drawings' estimates and the actual area of the walls, that this discrepancy was a defect in the drawings, that the defect was patently obvious, and that plaintiff was obligated to bring that defect to the government's attention if plaintiff intended subsequently to resolve the issue in its favor. *See Space Corp. v. United States*, 200 Ct.Cl. 1, 5, 470 F.2d 536, 538 (1972).

*Steam Cleaning*

Bromley submitted unit price bids for two categories of work in the Governor's

Island project: $1.00 per square foot for masonry restoration, and $0.53 per square foot for waterproofing of the masonry thus restored. Dispute arose over whether the work of steam cleaning should be classified as restoration or waterproofing. The Board examined the contract for guidance. It found that Division VII of Specification ecv–1769 of the contract deals with Moisture Protection. Section 713.3 thereof details the procedures and materials to be used by the contractor to steam clean the masonry before waterproofing was to be applied.

713.3 *Surface Preparation*

713.3.1 *Steam Cleaning*

Masonry and concrete surfaces where waterproofing is to be applied shall be thoroughly cleand [sic] of dirt, oil, and grease, loose particles and other foreign matter by the steam cleaning method.

The Board disagreed with Bromley's classification of steam cleaning as restorative, and denied plaintiff additional compensation:

given the location of the requirement in the waterproofing section of the specifications, steam cleaning should have been included in the $0.53 unit price. [Plaintiff's] failure to include it was a unilateral mistake for which it cannot recover.

*Bromley I*, 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,207 (citing *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492 (1967)). In its appeal to this court, plaintiff did not argue that the court erred in its understanding of the law of mistake, but rather that the Board's rejection of a stipulation of the parties rendered its ultimate conclusion arbitrary, capricious, and contrary to law. The stipulation to which plaintiff refers is among those to which the parties agreed before the entitlement hearings began.

*Stipulation 48*

(48) [Plaintiff] used the following work process in the masonry work: (1) scaffolding, (2) close examination, (3) raking, (4) cleaning out and moistening, (5) tuckpointing, (6) MEX-cleaning, (7) steam and high pressure water cleaning, (8) removal of scaffolding, and (9) cleaning of areas.

The Board entered this stipulation into the record as Stipulation 7. Plaintiff argued that stipulations of fact are binding on the parties absent special considerations, that there are no special considerations present, and that Stipulation 7 was binding on the Board.

We have no difficulty agreeing with the plaintiff that, absent special considerations, stipulations of fact are binding on the parties who make them. *E.g., Gersham & Co. v. United States*, 200 Ct.Cl. 97, 112, 470 F.2d 542, 551 (1972). We also see no special considerations which would release either party from its obligations under the stipulation agreement. We do, however, disagree with plaintiff's notions of the Board's obligations. Plaintiff argued that, by Stipulation 7, the parties to this dispute agreed that the contract required steam cleaning as part of restoration. Putting aside, for the moment, our misgivings that this is in fact the agreement reflected in the stipulation, plaintiff's contention must fail. Construction of the contract classifications is the very issue in dispute, and is a matter of law. Stipulations on questions of law most certainly do not bind a Board of Contract Appeals or any other judicial panel. *Swift & Co. v. Hocking Valley Ry.*, 243 U.S. 281, 289, 37 S.Ct. 287, 289–90, 61 L.Ed. 722 (1917); *Hegeman–Harris & Co. v. United States*, 194 Ct.Cl. 574, 581, 440 F.2d 1009, 1012 (1971), *Sac and Fox Tribe of Indians v. United States*, 161 Ct.Cl. 189, 198, 315 F.2d 896, 901, *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).

Even if, as we believe, the stipulation was properly an agreement on a statement of facts, a court or board may yet reject a stipulation if it is contrary to the facts on the record. *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 197, 488 F.2d 980, 988 (1973). However, we can find no evidence that the facts contradict the stipulation. In fact, we can find no evidence that the Board rejected the stipulation at all. The Board found that the masonry restoration work included cleaning the wall surfaces:

17. In addition to the portions already cited of Division II, Masonry Restoration, ... the following sections are applicable:

453 CLEANING

After repointing of joints and cracked brick is complete the contractor shall wash exterior surfaces of brick, concrete, and stone surfaces where repointing work was accomplished. These surfaces shall be scrubbed and washed with [a solution of] cleaning powder such as "MEX" [and] hot water.

*Bromley I,* 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,181 (brackets in original). This finding comports with provision (6) of the stipulation in issue. The Board also found that masons performed the steam cleaning immediately after they finished repointing each section of wall surface, and that painters then applied the waterproof coating. *Bromley I,* 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75185. This too comports with the work process recited in Stipulation 7. Stipulation 7 is no more than it appears to be; it is a statement of facts to which the parties agreed. It recites the nature of work performed, by whom[2], and in what sequence. The facts thus stipulated are consistent with the facts as found by the Board, and are consistent with the law applied to them. Plaintiff has argued no error in the Board's application of the law of mistake, and we find none. Plaintiff has also not demonstrated that the Board's decision lacked substantial evidence. The Board's decision vis-a-vis steam cleaning must, therefore, be upheld.

*Amount of Waterproofing*

■ The contract specifications listed square footage of the exterior masonry of several buildings to be waterproofed with a double coating of liquid sealant. The Board found that the contract had properly

been modified with respect to one of the buildings, and granted entitlement to plaintiff for waterproofing beyond the original specifications for the work on that building; No. 400[3]. Plaintiff claimed additional work on buildings 608, 612, 614, 949 and 950 which were waterproofed as well, but the Board denied additional entitlement.

The record does not indicate whether additional waterproofing was performed on the 900 and 600 buildings. [Plaintiff] was ordered not to do any additional work on the 600 buildings and is only entitled to the contractual amount for the 600 buildings. In addition, while [plaintiff] did some additional restoration on the 900 buildings, the contract provided for 6,370 square feet of restoration and 10,825 square feet of waterproofing. (Finding 15) The record does not indicate that [plaintiff] waterproofed more footage on these buildings. We therefore find [plaintiff] is not entitled to additional compensation on these buildings.

*Bromley I,* 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,206–07.

It is plaintiff's contention that the Board, in so holding, ignored certain "unrebuttable proofs" in the record tending to support plaintiff's assertion that it waterproofed "100%" of the 600 and 900 series buildings. Therefore, plaintiff argued, the Board's conclusion to the contrary is unsupported by the record.

The determination of substantiality of evidence on this issue as thus framed is misfocused. The Board's decision was that the record did not support plaintiff's claim. Plaintiff then argued before this court that the record does support its rejected claim rather than showing that the Board's decision is not supported by the evidence. This

2. Plaintiff argued vehemently that the distinctions between masons and painters as artisans warrants the conclusion that all work conducted by masons at a time coincident with the restoration process should be characterized as restoration. We do not find choice of personnel compelling as an argument for contract interpretation.

3. The buildings designated for repair in this contract were identified by numbers which cor-

respond roughly to the age of the buildings. Buildings 202, 206, 210, and 214 were constructed in 1811, building 400 was constructed in 1930, and buildings 608, 612, 614, 949, and 950 were constructed in 1951. The contract did not require waterproofing of the 200 series buildings, and compensation for the waterproofing of building 400, as noted above, has been resolved to the satisfaction of the parties.

formulation brings us perilously close to a reweighing of the evidence presented at the Board, a role we have heretofore refused to assume in Wunderlich Act review. *Gevyn Constr. Corp. v. United States,* 11 Cl.Ct. 203, 206 (1986), *aff'd,* 827 F.2d 752 (Fed.Cir.1987). In the interest of fairness to the parties, and in conformity with the proper scope of our review, we have considered the plaintiff's arguments in light of the whole record in order to rule on the soundness of the Board's conclusions.

Plaintiff reargued its evidence as presented to the Board in support of its claim to additional compensation for waterproofing. One such "proof" is a letter to plaintiff from the contracting officer, wherein she stated:

Completion of the contract includes the following work:

\* \* \* \* \* \*

b. Waterproofing all exterior masonry walls of buildings 608, 612, 614, 949 and 950.

If this letter were the contractor's only source of contract information it might reasonably believe that the contract required waterproofing of "all" or "100%" or indeed, every square foot of exterior masonry walls on the designated buildings. This letter, of course, was not the only such source. The contract specifications use the language "all exterior masonry walls," but also include figures indicating the amount, in square feet, of waterproofing required. Those specifications read, in relevant part:

DIVISION I—GENERAL REQUIREMENTS

101 SUMMARY OF WORK

\* \* \*

101.2 The work described herein and as shown on the drawings and specifications shall include the following.

\* \* \*

| | |
|---|---|
| Waterproof all exterior masonry walls of bldg. 949 | 6,265 ft$^2$ |
| Waterproof all exterior masonry walls of bldg. 950 | 4,560 ft$^2$ |

\* \* \*

| | |
|---|---|
| Waterproof all exterior masonry surfaces of bldg. 608, 612, 614 | 13,680 ft$^2$ |

There is substantial evidence in the record to show that the total area of the buildings is greater than the areas specified in the contract to be waterproofed. The government's measuring experts' report reads in pertinent part:

WATERPROOFING

GROSS AREAS OF BUILDINGS SPECIFIED TO BE WATERPROOFED (i.e., WITHOUT DEDUCTIONS FOR OPENINGS)

| | GROSS AREA SQUARE FEET |
|---|---|
| \* \* | \* |
| [Building] #608, 612, 614 | 17,328 |
| " #949 | 8,163 |
| " #950 | 5,800 |

There is also evidence, and a Board finding of fact to the effect that the plaintiff actually waterproofed the square footage so specified. Finding of Fact 53. On March 23, 1977, job inspector Fearer and contracting officer's representative Maturo checked the records and verified that the following quantities were waterproofed:

| WATERPROOFING | SQUARE FEET |
|---|---|
| \* | \* |
| [Building] 608, 612, 614 | 13,680 |
| 949 | 6,265 |
| 950 | 4,560 |

*Bromley I,* 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,189. Our review of the materials included in the entitlement hearing record reveals nothing, other than plaintiff's assertions of "100%" waterproofing, to negate the Board's conclusion. In its briefs before this court, plaintiff included lengthy excerpts from testimony taken during the quantum hearings in *Bromley II.* The Board in that proceeding reminded Bromley that its opportunity to argue entitlement had by that time long since passed. This court concludes that plaintiff has not carried its burden of persuasion in establishing that the Board's determination was arbitrary and capricious, erroneous or not supported by substantial evidence. This court, therefore, sustains the Board's conclusion with respect to the amount of waterproofing.

*Caulking*

Part of the masonry restoration process involved removal and replacement of loose

caulking around masonry joints, windows, and doors. The areas of work to be performed was indicated by shaded drawings, as it had been for other jobs in restoration. Before caulking work began, plaintiff notified the contracting officer that it had discovered other caulking material within the shaded areas which was not loose, but which was otherwise defective. Plaintiff offered to remove and replace the additional caulking at a unit price of $1.90 per lineal foot. The contracting officer agreed to the unit price for removal and replacement of this additional caulking. She advised plaintiff, however, that the contract required not only replacement of loose caulking, but also application of caulking to areas previously uncaulked and application of new caulking over old caulking within or adjacent to areas being restored. Plaintiff complied, under protest, asserting that the contract required only replacement of removed materials.

At the completion of the contract, plaintiff submitted an invoice for $14,086.60 for extra caulking. It claimed that it had replaced only 83 lineal feet of loose caulking as required by the contract, and that the defendant's unreasonable interpretation of the contract had added 7,414 lineal feet of additional work. When the claim was denied by the contracting officer, plaintiff argued before the Board that the actions of the contracting officer constituted a constructive change.

The Board denied plaintiff's claim, holding that plaintiff's construction of the contract disregarded the plain meaning of relevant specifications. It found that these specifications applied:

450 MASONRY RESTORATION

Shall include preparation and repair of surface areas and joints ... caulking of windows and doors.

452 SURFACE PREPARATION

452.2 If there is a question as to the integrety [sic] of a particular joint or brick, it shall be removed.

452.3 The contractor shall chip, out [sic] all loose caulking [and] power tool [out] cracked mortar from all masonry joints....

455 CAULKING

Shall be in accordance with paragraph 790. All window and door areas within and adjacent to areas being restored shall be caulked.

790 CAULKING AND SEALANTS

790.1 Install caulking around existing door frames and window frames, expansion joints and where metal equipment comes into contact with the brick walls after brick has been properly repaired and other joints as required. The caulking of window[s] and doors shall be done in areas where repointing is done and where new windows are installed.

* * * * * *

790.3 Apply the sealant according to manufacturer's recommendations.

*Bromley I,* 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,212–13.

 In its appeal to this court, plaintiff argued that the specifications to which the Board refers are ambiguous. The bulk of plaintiff's arguments here, as before the Board, rested upon a discussion of the relative effectiveness of surface caulking and application of new caulking over old, compared to removal and replacement. As the Board correctly determined, *Bromley I,* 1981–2 B.C.A. (CCH) ¶ 15,191, p. 75,214, express contract provisions will not be subordinated to contrary trade notions of efficacy or even quality. When the provisions of a government contract are unambiguous and capable of being performed, the government is entitled to compliance. *S.S. Silberblatt, Inc. v. United States,* 193 Ct.Cl. 269, 433 F.2d 1314 (1970); *WRB Corp. v. United States,* 183 Ct.Cl. 409 (1968).

Plaintiff did not argue that it was incapable of performing the work specified; indeed, the record reflects that plaintiff in fact performed the surface caulking as ordered. Neither has plaintiff convinced us that the language of the contract is anything but plain. On this issue, as on others, plaintiff's brief included reargument of events, intentions, and beliefs. Lest plaintiff forget, the scope of this court's review

is limited to the following question: Is the Board's decision supported by the record? No amount of superfluous assertions and allegations will misdirect this court into any other scope of review.

While specification 452.3 is the only provision requiring the *removal* of caulking, it is not the only provision governing the *application* of caulking. Paragraphs 455 and 790 say nothing to limit the application of caulking to areas from which damaged material has been removed. In order to adopt plaintiff's interpretation, that the contract required only replacement of loose or damaged caulking, the Board would have had to ignore and render meaningless relevant portions of the contract, in contravention of a long standing canon of contract construction. A contract

> must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieve a weird and whimsical result.

*State of Arizona v. United States*, 216 Ct.Cl. 221, 235, 575 F.2d 855, 863 (1978); see also *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751, 524 F.2d 680, 684 (1975); *United Pac. Ins. Co. v. United States*, 204 Ct.Cl. 686, 691–92, 497 F.2d 1402, 1405 (1974); *Jasmar, Inc. v. United States*, 194 Ct.Cl. 819, 826, 442 F.2d 930, 934 (1971); *Gelco Builders & Burjay Constr. Corp. v. United States*, 177 Ct.Cl. 1025, 1035, 369 F.2d 992, 999 (1966); *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965); Restatement (Second) of Contracts § 203(a) (1981).

The decision by the Board, rejecting plaintiff's interpretation of caulking requirements, is well supported by the record, by the plain meaning of the contract, and by sound principles of contract law, and is, therefore, sustained.

*Settlement Discussions*

After the Board's decision in *Bromley I*, the parties met to negotiate quantum. The parties ostensibly reached agreement on four claims,[4] including compensation for additional overhead costs and changed window conditions, discussed *infra*, to which the plaintiff had been granted entitlement. When the parties approached a fifth claim, they became aware of a difference of opinion involving interest; the government had thus far agreed on figures into which it assumed that additional funds for interest had already been incorporated, while the plaintiff assumed that additional funds for interest would yet be forthcoming. At this point, the contracting officer excused himself to seek advice from counsel. When he returned, he asked how much plaintiff felt entitled to recover on the remaining claims, and plaintiff responded with a figure of approximately $300,000.00. The contracting officer then explained that the Federal Procurement Regulations required an audit to be conducted for negotiations proposing amounts in excess of $100,000.00. He declared ineffective the amounts discussed for the four claims upon which figures had been agreed, and terminated the meeting.

Before the Board in *Bromley II*, plaintiff argued that a binding settlement had been reached on each of the claims discussed at the meeting. The government responded that the individual figures were effective only if agreement was reached on all claims, and that there had been no meeting of the minds. The Board examined both arguments, and found that the parties' disagreement on the issue of interest precluded any meeting of the minds. The Board went on to determine that, even if there had been a meeting of the minds on the four claims negotiated, any resulting settlement could not be enforced. The contracting officer, it held, was bound by the Federal Procurement Regulations which required that an audit be performed. There had been no audit, and the contracting officer was, therefore, without authority to

4. Two of these four have not been appealed to this Court.

bind the government. The Supreme Court of the United States has held:

> [A]nyone entering into an agreement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.

*Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *see also Pia v. United States,* 7 Cl.Ct. 208, 211 (1985), *aff'd,* 818 F.2d 876 (Fed.Cir.1987). In the case at bar, the contracting officer's authority was limited by the Federal Procurement Regulations to which the Board referred, which read, in pertinent part,

> (b) *Auditors' reports on contract price proposals.* (1) Prior to negotiation of any contract or modification resulting from a proposal in excess of $100,000 (including ... modifications to formally advertised contracts), where the price will be based on cost or pricing data (§ 1–3.807–3) submitted by the contractor, the contracting officer shall request an audit review by the contract audit activity. In arriving at the aggregate amount involved in a contract or modification, there shall be included all personal property and non-personal services (including construction) which would properly be grouped together in a single transaction. Requirements shall not be split into several contracts or modifications which are less than $100,000, but which aggregate more than $100,000.
>
>> (i) The requirement for audit of proposals which exceed $100,000 may be waived by the contracting officer whenever it is clear that information already available is adequate for the proposed procurement. In such case, the contract file shall be documented to reflect the reason for any such waiver: *Provided, however,* That independent Government estimates of cost or price shall not be used as the sole justification for any such waiver (see § 1–3.811(a)(4)).

41 C.F.R. § 1–3.809(b)(1) (1975).

Plaintiff used several interesting but hardly novel approaches in its attempts to show that the contracting officer possessed the requisite authority to bind defendant. Plaintiff cited an Armed Services Board of Contract Appeals decision, wherein a contractor was held to be unable to repudiate a settlement, since the contractor's representative was clothed with apparent authority to negotiate on his behalf. Plaintiff's apparent purpose of including this information in its brief was to show that parties have been bound to agreements reached by agents with apparent authority, *e.g.,* the contracting officer here. It is well established, however, that the doctrine of apparent authority does not apply to the federal government. *Pia,* at 211. The case cited by plaintiff, involving the apparent authority of a civilian contractor's representative, is wholly inapposite.

Plaintiff also directed our attention to a General Services Administration Board of Contract Appeals case, wherein the Government was held bound by the decision of an authorized contracting officer, despite mistakes of facts or law embodied in that decision. *Maykat Enters., N.V.,* 1984–3 B.C.A. ¶ 17,510 (1984). This case, too, is wholly inapposite. The cited case did not reach the contracting officer's authority; it was simply not in dispute. By contrast, the very existence of any authority at all is the threshold question in the case at bar.

Without sufficient explanation of its purpose for asserting the above argument, plaintiff here stated that the contracting officer was "willing to live up to the settlement agreements until ... the Government attorney ... warned him not to honor the settlements already made." Plaintiff bears the burden of showing that the officials who allegedly enter agreements are in fact authorized to negotiate and to commit the government to such an agreement. *Pia v. United States,* 7 Cl.Ct. 208, 211 (1985), *aff'd,* 818 F.2d 876 (Fed.Cir. 1987) (citing *Lehner v. United States,* 1

Cl.Ct. 408, 415 (1983)). The statement quoted above adds nothing to substantiate such a showing.

■ Plaintiff also argued that each of the four claims in issue was negotiated and settled separately and that since each was under $100,000 the audit requirement would not operate to negate the contracting officer's authority. However, by the express terms of the regulation the audit requirement may not be rendered a nullity by "split[ting the claims] into several contracts or modifications which are less than $100,000, but which aggregate more than $100,000." 41 C.F.R. § 1–3.809(b)(1) (1975).

■ Plaintiff also argued a waiver theory. The contracting officer knew in advance of the settlement meeting that the plaintiff was asking for more than $100,000 total in settlement,[5] but failed to request an audit review prior to negotiations. Therefore, the contracting officer must be deemed to have waived the requirement. Plaintiff's apparent reference to the audit requirement provision suggests that the terms of the requirement are couched permissively. A permissive construction would give the contracting officer an opportunity to ask for an audit, and that such an opportunity missed would be an opportunity lost. The regulations, however, are clearly mandatory; they provide that "the contracting officer ... *shall* request an audit review." 41 C.F.R. § 1–3.809(b)(1) (1975) (emphasis added). The regulation includes no language permitting an implied waiver for mere failure to request an audit prior to negotiation. Prior to an audit, the contracting officer quite simply had no authority to negotiate an agreement in excess of $100,000.

In the alternative, plaintiff suggested that the express waiver provision in section 1–3.809(b)(1)(i) of the regulation operated to waive the audit requirement. That provision states that the audit requirement "may be waived by the contracting officer whenever it is clear that information already available is adequate for the pro-

posed procurement." Plaintiff asserted that the contracting officer "obviously" had adequate information available, since the parties had reached mutual agreement on the four claims negotiated. Plaintiff's argument, while having some intuitive appeal, must fail for several reasons. Clearly, plaintiff has again confused permissive and mandatory constructions. The audit waiver provision is permissive; it requires affirmative action by the contracting officer to operate. The waiver is not something which happens to the contracting officer, but rather something which may be made to happen by the contracting officer. We must therefore look for positive evidence of the contractor's having exercised the waiver option. The language of the provision itself prevents the contracting officer from making an inadvertent waiver. When a contracting officer elects to exercise the waiver option, the regulation requires that "the contract file shall be documented to reflect the reason for any such waiver." 41 C.F.R. § 1–3.809(b)(1)(i) (1975). Plaintiff has cited no such documentation as mandated by the regulation; the Board found none and we find none.

It may have been the case that the contracting officer began these negotiations in the hope that the parties could reach agreement on amounts totaling less than $100,-000, so that an audit would not have been necessary. Indeed, the government's estimates, prepared before the negotiations and used by both parties during the settlement meeting, proposed a figure for settlement of all of plaintiff's claims well below the $100,000 limit. By the time the contracting officer terminated the meeting, however, the parties had considered only four claims and had already exceeded the government's estimate for the plaintiff's total recovery. Moreover, on the remaining two claims as yet undiscussed, the plaintiff claimed entitlement to a figure three times the total amount to which the contracting officer was authorized to agree. At that time, the contracting offi-

---

5. In fact, plaintiff was asking for more than $700,000 to settle claims arising from a contract with an original price of $143,320.

cer indicated that an audit would have to be conducted. Such behavior is hardly indicative of an exercise of waiver. Yet even if the contracting officer had set out to negotiate a settlement under $100,000, as seems likely from the estimates he had prepared, the regulations would clearly not permit him to avoid the audit once it became clear that the limit would be exceeded. The waiver provision expressly prohibits exercise of the waiver option based solely on government estimates of cost. 41 C.F.R. § 1–3.809(b)(1)(i) (1975).

For the foregoing reasons, plaintiff has failed to meet its burden. Plaintiff has not established that the contracting officer had the authority to bind the government, and has failed to establish that the Board erred in holding that he did not. We find as a matter of law that the contracting officer was not authorized, under 21 C.F.R. § 1–3.809(b) (1975), to bind the government to a settlement in the amounts discussed. We, therefore, do not reach the issue of whether there was otherwise sufficient meeting of the minds for a valid settlement agreement.

*Extended Overhead*

 In *Bromley I*, the Board determined that Bromley was entitled to any demonstrated general and administrative costs and overhead costs incurred as a result of a 148 day increase in the work performance period of the contract. In *Bromley II*, the Board considered plaintiff's quantum claim on the merits. The Board reviewed the plaintiff's figures, ostensibly presented under the *Eichleay* formula of recovery. That formula, developed in *Eichleay Corp.*, 1960–2 B.C.A. (CCH) ¶ 2688, *motion for recon. denied*, 1961–1 B.C.A. (CCH) ¶ 2894 (1960), is used to estimate equitable compensation for increases

in overhead costs, where the fact of damage is readily found but the quantum is not. The Board, however, denied plaintiff any recovery. Plaintiff, it determined, only demonstrated that the performance period had been extended, but had not demonstrated that any costs incurred during that period exceeded the markups for overhead and profit already awarded.[6] There could be no application of any formula of compensation without some showing of unabsorbed costs to compensate.[7] Nowhere in its briefs did plaintiff even attempt to show that it incurred costs which remained unabsorbed by the blanket markups or other work, nor did it point to evidence in the record to support that assertion. The mere assertion that "[t]he overhead allowed as direct markups did not adequately compensate Bromley for the extended performance period" hardly constitutes a showing of costs incurred over and above those markups. In the absence of a credible showing otherwise, the findings of the board of contract appeals is final and conclusive. *Koppers Co., Inc. v. United States*, 186 Ct.Cl. 142, 147, 405 F.2d 554, 557 (1968); *Gevyn Constr. Corp. v. United States*, 11 Cl.Ct. 203, 206 (1986), *aff'd*, 827 F.2d 752 (Fed.Cir.1987). Plaintiff has made no showing. The Board's decision must stand.

*Changed Conditions*

In *Bromley I*, the Board found the plaintiff entitled to additional compensation for changed site conditions involved in the renewal of windows under the contract. In *Bromley II*, plaintiff was awarded compensation for that entitlement. Before this court, plaintiff stated merely that it wanted more than the amount awarded by the Board. Plaintiff shows no impropriety in

---

6. Though no audit had been performed prior to the settlement negotiations discussed above, a subsequent audit resulted in the parties' agreement to overall overhead and profit markups of 50.8% and 10% respectively. The Board ratified these figures as reasonable, and ordered compensation accordingly. *Bromley II*, 1984–2 B.C. A. ¶ 17,233, p. 85,823.

7. The plaintiff's formula, the Board said, was "long on figures and short on substance." *Bromley II*, 1984–2 B.C.A. (CCH) ¶ 17,233, p.

85,825. The classic *Eichleay* formula divides total contract billings by total billings for the contract period to obtain a fraction by which to multiply total overhead costs incurred during and beyond the contract period. The resulting figure estimates costs allocable to the extended work period. Plaintiff instead based its figures only on the original contract period, and then multiplied the per day cost estimate by the 148-day extension.

the Board's computation method. Its entire argument on this matter consisted of a reassertion of the validity of the settlement agreements discussed above, and carries no more weight. Therefore, the Board's decision must be sustained.

*Measurement for Payment Purposes*

■ As noted above, bidders to this contract proposed unit prices based on shaded drawings and their companion specifications. The specifications included rough, sometimes very rough, estimates of the square footage depicted in the shaded drawings, reached by estimating the percentage of gross wall surface shaded.[8] Armed with drawings and specifications, plaintiff set to work restoring the exterior masonry of designated buildings. As the work progressed, plaintiff was ordered to expand its restoration beyond the shaded area. Plaintiff complied, and was promised compensation for the additional restoration at the original unit price of $1.00 per square foot.

Throughout the work process, and again after all work was completed, various measurements were taken of the wall surfaces of Building 400. All parties agreed to roughly equivalent figures representing the gross (about 140,100 square feet) and net (about 120,000 square feet) areas of Building 400, and the actual square footage of restoration completed by the plaintiff (72,722 square feet).[9] The Government offered to pay plaintiff for the amount of work actually completed, both the original shaded areas and the additional unshaded areas. Plaintiff, at that time, insisted that it should instead be paid according to the net area of the entire building. Two months later, it decided it should be paid according to the gross area of the building, a figure nearly twice as large as the amount of restoration it had actually performed.

The Board rejected both gross area measurement and actual area measurement as appropriate methods of payment. In rejecting gross measurement, the Board noted that although the original estimate for Building 400 was a percentage of the gross area, as estimated by the amount of shading on the drawings, no windows were shaded. Further, the original bid package estimate of the shaded area and the subsequent measurements of the shaded area differed by an amount far less than the area of all the openings in the shaded area, indicating that the openings were not included in the original bid estimate. The Board also found unreliable some of the figures upon which plaintiff based its claim to gross measurement compensation. Finally, the bulk of the work process used in the restoration of building 400 had nothing to do with window and door openings. On the other hand, the Board determined that plaintiff's total work process had exceeded the bounds of actual square footage restored to the extent that payment according to actual footage restored would be inadequate to compensate plaintiff for the work it had performed. Moreover, the parties had stipulated that while no nationwide measurement standard existed for masonry repointing the method commonly followed in New York uses the net surface of the wall. Therefore, the Board found net measurement appropriate for plaintiff's compensation.

Plaintiff failed specifically to question the factual findings or to discuss the reasoning underpinning the Board's conclusions. Plaintiff simply asserted that the Board was wrong and proceeded to reargue its version of the facts as presented to the Board. Plaintiff asserted that it bid and performed the restoration on the assumption that gross measurement was the standard of compensation contemplated by the parties from the outset of the contract. In so arguing, however, plaintiff neglected

8. Gross measurement is the entire surface of a wall, less only window and door openings greater than 100 square feet in area. Gross area thus includes all window and door openings less than 100 square feet in area. Net area excludes all openings.

9. This figure is the mathematically erroneous sum of the shaded and unshaded areas actually restored, as measured by Fearer and Maturo. The error, however, had no bearing on the decision of the Board, nor has it on ours.

to explain why, when dispute over compensation first arose, it sought net area compensation. Plaintiff also reargued its position on steam cleaning as part of the restoration process. The Board, as we have already seen, determined that steam cleaning was contractually linked to waterproofing and should not be compensated at the restoration unit price. Plaintiff asserted to the court, however, that the reason for that determination was not based on contract interpretation rather, that the Board refused to include steam cleaning, commonly compensated by gross area measurement, in the restoration process solely to avoid awarding gross measurement compensation to the plaintiff. This assertion implies bias or prejudice on the part of the Board and, without considerably more evidence than plaintiff's say-so, has no place in this or any other adjudicatory proceeding. In its reply brief, plaintiff then asserted that net area compensation as a trade practice is "asinine," though it does not explain why it entered a stipulation clearly stating that such "asinine" practice is the practice commonly followed in the New York area.

On this issue, as on so many others, plaintiff has done no more than to say "we want more." Much more than that is necessary to meet plaintiff's burden of proof. Plaintiff's contention with respect to the Board conclusion that net area is the appropriate measurement does not establish that the Board's conclusion lacked support by substantial evidence.

*Cost of Restoration*

▮ In *Bromley I*, the Board determined that the contract required only restoration of cracked mortar joints. Plaintiff, however, had also been ordered to repoint recessed joints, and the Board found that this was an increased work requirement beyond the scope of the original contract for which plaintiff was entitled to additional compensation. The Board then computed the square footage of this extra repointing into its measurement analysis, as discussed above. Plaintiff's entitlement thus included both additional net square footage of contract restoration, *i.e.*, repointing of cracked joints in the unshaded areas, as

well as the net square footage of additional work, *i.e.*, repointing of recessed joints, in both the shaded and unshaded areas.

In order to assign value to the recessed joint restoration the Board considered the work completed in light of the contract requirement, both in terms of place of work, shaded or unshaded, and type of work, contract or increased requirement. In the contract's original, shaded areas, plaintiff was entitled to compensation for additional wetting, buttering, and MEX–cleaning. In the additional unshaded areas plaintiff was entitled to compensation for restoration without raking. Restoration without raking includes wetting, buttering, and MEX–cleaning, but also includes close examination. The Board found that, since the contract work of repointing cracked joints in the shaded areas included close examination, plaintiff was not entitled to any special recovery for close examination in the shaded areas.

Because the parties, could not agree on quantum the Board undertook the task of assigning value to each facet of the additional work performed. Inasmuch as plaintiff did not produce documentation of costs actually incurred, the Board was forced to compare data from a variety of sources to determine quantum value by a jury-verdict type analysis.

Plaintiff submitted the dollar amounts it sought, and the contracting officer provided the figures proposed by the government. These figures, together with the estimates of two expert consulting firms, comprised the pool of information for the Board's consideration. Each source had some weaknesses. Plaintiff, for example, failed to demonstrate with sufficient particularity how its estimates, allegedly the same used to prepare its original $1 per square foot bid, had been calculated. The estimates of the contracting officer and consulting experts were often founded on unreasonable presumptions or questionable methodology. Nevertheless, the Board weighed the evidence before it, and arrived at unit prices it found reasonable. It then multiplied these prices by net square footage figures and awarded compensation.

In its appeal on this issue, plaintiff suddenly recognized and attempted to meet its burden of proof. As we have by now come to expect plaintiff reargued its versions of the facts. In an unusual twist, though, plaintiff apparently attempted to prove an issue not even in dispute. The Board had already ruled in favor of plaintiff on entitlement for increased work requirements. It was, therefore, unnecessary for plaintiff to urge that it was somehow duped into bidding only on cracked joints, while the government intended, but failed, to include recessed joints into the contract. Plaintiff also provided various cost factors and calculations whereby additional contract work and additional work requirements were separated, calculated according to the defendant's original pre-bid cost estimate, and compared to the total contract value. None of plaintiff's proposed cost factors and formulas challenged the Board's reasoning or findings. Finally, plaintiff attempted to rehabilitate the credibility of the two consulting firms' estimates rejected by the Board, again without reference to the Board's assessment of their credibility. The purpose of this proposed rehabilitation quite eludes us, as the unit prices ultimately found by the Board are in every instance higher than those proposed by the experts. Needless to say, plaintiff has failed to establish a sufficient basis for reversal of the Board's decision without a showing that plaintiff's argument related to the Board's findings and analysis. *Vista Scientific Corp. v. United States*, 808 F.2d 50, 53 (Fed.Cir.1986), *aff'g*, *Vista Scientific Corp. v. United States*, No. 203–83C (Cl.Ct. Jan. 31, 1986).

## CONCLUSION

In the opinion of this court, plaintiff has failed to meet the burden imposed by the Wunderlich Act under which it seeks review. Plaintiff has already enjoyed equitable adjustment for the Governor's Island contract but has failed to demonstrate that the conclusion of the Department of Transportation Board of Contract Appeals was improper under Wunderlich Act standards. Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The Clerk is directed to dismiss the complaint and enter judgment in favor of defendant.

IT IS SO ORDERED.