ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Korte Construction Company | ) | ASBCA No. 63148 |
| | ) | |
| Under Contract No. W912BV-19-C-0017 | ) | |

APPEARANCE FOR THE APPELLANT:     Michael E. Wilson, Esq.
    Greenfelder, Hemker & Gale, P.C.
    St. Louis, MO

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
    Engineer Chief Trial Attorney
    Lauren M. Williams, Esq.
    Thomas R. Alford, Esq.
    Engineer Trial Attorneys
    U.S. Army Engineer District, Tulsa

OPINION BY ADMINISTRATIVE JUDGE STINSON
ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

Appellant Korte Construction Company (Korte) appeals a contracting officer's October 22, 2021, final decision denying Korte's August 24, 2021, claim requesting the government rescind its unilateral contract modification assessing a credit of $493,639.43, in direct and indirect costs for a deductive change to contract work. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties submitted opposing motions for summary judgment, responsive and reply briefs, as well as exhibits to be considered in deciding this appeal.[1] For the reasons stated below, appellant's motion for summary judgment is denied and the government's motion for summary judgment is granted.

---

[1] "App. mot." refers to appellant's March 20, 2023, motion for summary judgment; "gov't mot." refers to the government's March 20, 2023, motion for summary judgment; "app. resp." refers to appellant's May 10, 2023, response to the government's motion for summary judgment; "gov't resp." refers to the government's May 10, 2023, response to appellant's motion for summary judgment; "app. reply" refers to appellant's June 9, 2023, reply brief; and "gov't reply" refers to its June 9, 2023, reply in support of its motion for summary judgment.

SYNOPSIS

This appeal presents the issue of whether the government is entitled to a credit under a deductive change request where the contractor alleges it did not include in its cost proposal amounts required to perform work that is the subject of the deductive change request. Korte offers evidence that its mechanical subcontractor, who submitted a bid for the work that was incorporated into the contractor's cost proposal, determined that the work was not required under the contract, and, accordingly, did not price that work.

Korte now seeks to use as a shield the fact that, through incorporation of its subcontractor's bid into its cost proposal, Korte's contract price did not include the cost to perform work covered by the deductive change order and, as such, the government is not entitled to a credit for the work not performed. While it is true that, for certain purposes, a subcontractor's interpretation will be imputed to a contractor if it proves that the subcontractor relied upon that interpretation in submitting its bid, the defect in Korte's armor is that the contractor is not protected if the interpretation by the subcontractor is indefensible, and here, the evidence Korte offers in its motion for summary judgment establishes that its subcontractor recognized pre-award an ambiguity in the contract regarding whether the work was required to be performed but did not seek clarification regarding that work. Korte suggests that reference to the work in the solicitation was simply a scrivener's error, one it admittedly had knowledge of during the solicitation process. However, Korte's motion for summary judgment admits knowledge of an ambiguity in the solicitation, one which appellant was required to raise with the government pre-award but failed to do so.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

The parties submitted a Joint Stipulation of Material Facts (JSMF) in support of their motions for summary judgment. Our statement of facts relies upon, and adopts, certain of the parties' JSMF, as set forth below.

RFP Phase 1

1. On October 11, 2018, the government issued the Phase 1 Request for Proposals (RFP) for Solicitation No. W912BV-18-R-0047 (JSMF ¶ 1; R4, tab 3). The Phase 1 RFP sought design-build proposals for a new KC-46A Depot Fuel Hangar project at Tinker Air Force Base and contemplated award of a firm fixed-price contract as part of a two-phase competitive solicitation (JSMF ¶ 2; R4, tab 3 at COE R4 3-0001).

2. The Phase 1 RFP included specification section 00 21 00, INSTRUCTIONS, CONDITIONS AND NOTICES TO OFFERORS (R4, tab 3 at COE R4 3 - 0004).

2

Paragraph 1.4, which provided information regarding offerors' questions and comments, instructed that "[a]ll contractual matters, questions and or comments relative to these documents should be submitted via Bidder Inquiry in ProjNet" (*id.* at COE R4 3 - 0005).

3.  The Phase 1 RFP included specification section 00 22 20, PHASE 2 DESIGN-BUILD SELECTION PROCEDURES AND BASIS OF AWARD (R4, tab 3 at COE R4 3 - 0036).  Paragraph 3.8, TAB A – DEVIATIONS, EXCEPTIONS, AND ASSUMPTIONS, stated, in part:

> Should the Offeror have any questions related to specific terms and conditions, these must be resolved prior to submission of the offer.  Notwithstanding the above, if deviations and exceptions are included with the offer, the Offeror shall list and describe in detail the deviations and/or exceptions under Tab A.

(*Id.* at COE R4 3 - 0041) (underlining in original)[2]

4.  The Phase 1 RFP included specification section 01 10 05.00 setting forth a statement of work and mechanical requirements for the project (R4, tab 3 at COE R4 3 - 0187).  Paragraph 4 of section 01 10 05.00 set forth specifications regarding heating, ventilation, and air conditioning systems (*id.* at COE R4 3 - 0193).  Paragraph 4.4.4 set forth requirements for the "Air cooled chiller," stating, "[t]he Tinker Air Force Base existing chilled water loop will be utilized to provide cooling to the facility" (*id.* at COE R4 3 - 0198).  Paragraph 4.4.5 set forth specifications regarding the chilled water system (*id.*).  Paragraph 4.5 set forth specifications regarding piping and paragraph 4.5.1 set forth specifications regarding chilled water piping (*id.* at COE R4 3 - 0199).

Korte's Mechanical Engineer and Subcontractor

5.  Charles E. Jarrell Contracting Company d/b/a Jarrell Mechanical (Jarrell or Jarrell Mechanical) was part of Korte's design-build team for the Project and the mechanical subcontractor.  Jarrell was "delegated the responsibility for preparing the drawings for Korte's proposals for the Project to design team members" and as "the mechanical engineering firm of record, in this case, Jarrell, was responsible for determining whether chilled water piping was required."  (App. mot. at 2 (app. facts ¶ 3) (citing app. mot. ex., Feb. 23, 2023, D. Brauer dep. 35:14-17, 37:24-38:2, 51:19-53:9, 75:22-76:5, 76:9-77:18 , 79:13-80:3)) (*see also* app. resp. ex., May 10, 2023,

---

[2] The RFP Phase 2 specifications included a similar provision (JSMF ¶ 8; R4, tab 6 at COE 6 - 0013, 0020).

M. Jarrell decl. at 1)  The government's Statement of Genuine Issues of Material Fact responds to appellant's Facts submission ¶ 3, denying the allegations and stating, "[p]aragraph 3 characterizes the responsibilities of Korte's subcontractors with which the Government has no contractual relationship. In addition, this is not material for resolution of this Appeal" (gov't resp. at 3).  In the context of a motion for summary judgment, the government's stated objection is wholly insufficient as a basis to properly challenge or controvert the facts set forth by appellant in paragraph 3.

6.  Korte states that "[d]uring the Project solicitation stage, Jarrell Mechanical's project team interpreted the solicitation documents including the concept drawings as not calling for any chilled water improvements" (app. May 10, 2023, Statement of Additional Material Facts ¶ 11) (citing app. mot. ex., Feb. 23, 2023, M. Jarrell dep. 24:6-13, 33:12-35:7, 40:1-41:10, 42:4-22; R4, tab 45; Feb. 23, 2023, D. Brauer dep. 77:6-18; Mar. 20, 2023, D. Brauer decl. ¶ 4).  The government's response to appellant's Statement of Additional Material Facts ¶ 11 states "[t]he Government is without sufficient information to admit or deny what Korte's subcontractor, Jarrell Mechanical's project team interpreted; therefore, denies" (gov't reply at 6).  In the context of a motion for summary judgment, the government's stated objection is wholly insufficient as a basis to properly challenge or controvert the facts set forth in paragraph 11.

7.  On November 13, 2018, Korte submitted a Phase 1 proposal and on January 7, 2019, submitted a revised Phase 1 proposal (JSMF ¶¶ 4-5; R4, tabs 15-16).

RFP Phase 2

8.  On January 29, 2019, the government issued RFP Amendment No. 0003, which included the RFP Phase 2 revised solicitation dated January 17, 2019 (JSMF ¶ 6; R4, tab 6 at COE R4 6 - 0001-0002).

9.  RFP Phase 2 included a revision to section 01 10 05.00 (STATEMENT OF WORK – MECHANICAL REQUIREMENTS, specifically paragraph 4.4.4, deleting the following statement (as it appeared in RFP Phase 1), "Air cooled chiller: The Tinker Air Force Base existing chilled water loop will be utilized to provide cooling to the facility" (*see* SOF ¶ 4), and replacing it with "Air cooled chiller: A single air-cooled chiller may be provided" (R4, tab 6 at COE R4 6 – 0196, 0209).

10.  Another revision to section 01 10 05.00 was the addition of a new paragraph 4.5.6, which stated, "[e]xtend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar.  Provide connection location for future projects" (JSMF ¶ 7; R4, tab 6 at COE R4 6 – 0198, 0211).  This new provision also was included in subsequent revisions to RFP Phase 2, specifically, (1) RFP Amendment No. 0005, issued on February 21, 2019, included the same information set

4

forth in the same numbered paragraph 4.5.6 (JSMF ¶ 17; R4, tab 8 at COE R4 8 - 0218), (2) RFP Amendment No. 0007, issued on March 8, 2019, included the same information, but it appeared in a new paragraph 4.4.11.6 (JSMF ¶ 20; R4, tab 44 at COE R4 44 - 0150) (*see also* R4, tab 12 at COE R4 12 – 0218), and (3) RFP Amendment No. 0009, dated May 9, 2019, included the same information, again in paragraph 4.4.11.6, and was "issued to provide clarification between subsequent amendments, provide a comprehensive document of changes from [sic] Amendment 0007 and Amendment 0008, and incorporate new revisions into the solicitation" (R4, tab 12 at COE R4 12 - 0001).

RFP Phase 2 Drawings

11. RFP Phase 2 included numerous schematic drawings, several of which depicted three parallel lines labeled "CW" running east to west, located north of the hangar, specifically, Contract Drawing CG101, the Conceptual Grading and Drainage Plan (R4, tab 6 at COE R4 6 - 0901, tab 8 at COE R4 8 - 0862, tab 12 at COE R4 12 - 0859, tab 44 at COE R4 44 - 0791) and Contract Drawing CU101, the Conceptual Civil Utility Plan (R4, tab 6 at COE R4 6 - 0909, tab 8 at COE R4 8 - 0870, tab 12 at COE R4 12 - 0867, tab 44 at COE R4 44 - 0799; *see also* JSMF ¶ 11). In its briefs, the government assigns the term "chilled water" to the demarcation "CW," although that specific acronym is not set forth or defined in Contract Drawings CG101 and CU101 (gov't mot. at 2 n.1; *see* R4, tab 6 at COE R4 6 - 0901 (Contract Drawing CG101) and COE R4 6-0909 (Contract Drawing CU101)).

12. Various other lines appear on Contract Drawing CG101, some of which have a keynote number pointing to them. An information box on the righthand side of the drawing, titled "Sheet Keynotes," includes four keynotes with descriptions. Lines without a keynote also appear on this drawing. Among the lines without a keynote are the three parallel lines labeled "CW" running east to west, located north of the hangar between two boxes which likewise have no corresponding keynote. (JSMF ¶ 14; R4, tab 6 at COE R4 6 - 0901).

13. Various other lines appear on Contract Drawing CU101, some of which have a keynote number pointing to them. A box on the righthand side of the drawing titled "Sheet Keynotes" includes sixteen keynotes with descriptions. Lines without a keynote also appear on this drawing. Among the lines on this sheet without a keynote pointing to them are the three parallel lines labeled "CW" running east to west, located north of the hangar between two boxes which likewise have no corresponding keynote. Under the moniker "General Sheet Notes" appears the statement: "Refer to sheet C-001 and C-002 for general civil notes, legends, and abbreviations." (JSMF ¶ 15; R4, tab 6 at COE R4 6 - 0909).

5

14.  Contract Drawing C-001, Abbreviations and Existing Conditions Legend, includes underneath the moniker "Existing Conditions Legend, Continued" the following two symbols:  "—12" CWS1—" and "—12" CWR1—", with the following descriptions:  "Chilled Water Supply" and "Chilled Water Return."  Also included under "Abbreviations" are CWR and CWS, with the following description:  "Chilled Water Return" and "Chilled Water Supply."  (JSMF ¶ 12; R4, tab 6 at R4 6 - 0884; *see also* JSMF ¶ 28)

15.  Contract Drawing C-002, Civil Legend, sets forth two columns, one titled "Proposed" and another to the right titled "Description."  Symbols for various lines such as "force main," "fire water line," "industrial waste," "sanitary sewer," "storm sewer," "natural gas line," "compressed air line," and "water line," are included among the civil legends.  The columns on this sheet do not include the words "chilled water." (JSMF ¶ 13; R4, tab 6 at COE R4 6 - 0885)

16.  The solicitation incorporated by reference FAR 52.243-4, Changes (JUN 2007).  The solicitation also incorporated by reference FAR 52.236-21 Specifications and Drawings for Construction (FEB 1997), which stated, in part:

> (a) . . . In case of difference between drawings and specifications, the specifications shall govern.  In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing.  Any adjustment by the Contractor without such a determination shall be at its own risk and expense.  The Contracting Officer shall furnish from time to time such detailed drawings and other information as considered necessary, unless otherwise provided.

(JSMF ¶¶ 38-39; R4, tab 12 at COE R4 12 - 0049; *see also* R4, tab 26 at COE R4 26 - 0013)

Inquires of Other Offerors Through ProjNet

17.  On February 6, 2019, an offeror submitted the following inquiry (question no. 7829421) through the ProjNet system:  "RFP section 01 10 05.00 00, 4.5.6 requires relocation of the campus chilled and hot water pipes.  The civil plans do not show any existing campus chilled or hot water pipes.  Can drawings of the existing pipes be provided?"  (R4, tab 49 at COE R4 49 - 0017)  On February 27, 2019, the government provided the following response to question no. 7829421:  "The CHWS and CHWR lines shown are per the FY 15 Support Infrastructure project and show the lines routed

6

north in order to avoid the Fuel Hangar footprint.  The awarded-Contractor must confirm this is the case prior to design and construction." (*Id.*)

18.  On February 19, 2019, an offeror submitted the following inquiry (question no. 7851655) through the ProjNet system:  "In the RFP Phase I document (Section 011005 paragraph 4.4.4) it states 'The Tinker Air Force Base existing chilled water loop will be utilized to provide cooling to the facility'.  The same paragraph in the Phase 2 solicitation states that 'a single air cooled chiller may be provided.'  Please advise if the TAFB existing chilled water loop is to be utilized or is a new chiller to be provided?"  (R4, tab 50 at COE R4 50 - 0007)  On March 14, 2019, the government provided the following response to question no. 7851655:  "Reference amendment" (*id.*).

19.  On February 19, 2019, an offeror submitted the following inquiry (question no. 7851662) through the ProjNet system:  "If there is a district heating and cooling system on base, and we utilize this, are we still obligated to provide a treatment system for the makeup water to chilled water, heating water, and condenser water systems (section 011005 paragraph 4.8) at the Fuel Hangar and the Depot Maintenance Hangar?" (R4, tab 50 at COE R4 50 - 0007).  On March 14, 2019, the government provided the following response to question no. 7851662:  "Provide chilled water system and hot water system at the building per RFP documents" (*id.*).

20.  On February 19, 2019, an offeror submitted the following inquiry (question no. 7851659) through the ProjNet system:  "In the RFP Phase I document (Section 011005 paragraph 4.6.3.1) it states 'Heating for the building shall be provided by existing hot water boiler(s) from the Tinker AFB hot water loop'.  The sam [sic] paragraph in the Phase 2 solicitation states that 'Heating for the building shall be provided by packaged natural gas fire high efficiency condensing type hot water boiler (s)'.  Please advise it [sic] the existing hot water loop is to be utilized or if new boilers are required."  (R4, tab 50 at COE R4 50 - 0007)  On March 14, 2019, the government provided the following response to question no. 7851659:  "Provide new boiler system per RFP and amendments" (*id.*).

21.  On March 15, 2019, an offeror submitted the following inquiry (question no. 7893440) through the ProjNet system:  "RFP states: Extend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar.  Are we required to extend CHW and HW to the hangar if we are not utilizing either service for this facility?"  (JSMF ¶ 22; R4, tab 14)  On April 8, 2019, the government provided the following response to question no. 7893440:  "Extend the base wide systems per the RFP" (JSMF ¶ 23; *id.*).

Korte's RFP Phase 2 Proposals

22.  On May 31, 2019, appellant submitted its RFP Phase 2 technical proposal, and on July 18, 2019, submitted its revised RFP Phase 2 proposal (JSMF ¶¶ 33-34; R4, tabs 20-23).  Both of Korte's RFP Phase 2 proposals included annotated versions of drawings contained in the solicitation that included three parallel lines labeled "CW" running east to west, located north of the hangar (R4, tab 20 at COE R4 20 – 0074 (Proposal Drawing C-208, Grading Plan); R4, tab 20 at COE R4 20 - 0081 (Proposal Drawing C-215, Utility Plan); R4, tab 23 at COE R4 23 - 0074 (Proposal Drawing C-208, Grading Plan); R4, tab 23 at COE R4 23 - 0081 (Proposal Drawing C-215, Utility Plan)).  Korte's May 31, 2019, RFP Phase 2 Technical proposal, Tab A, and RFP Phase 2 Price proposal, Tab B, both state:  "The Korte Company is not proposing any deviations, exceptions or assumptions to the terms or conditions of the Solicitation for the KC-46A Fuel Maintenance Hangar at Tinker Air Force Base" (JSMF ¶ 33; R4, tab 20 at COE R4 20 - 0005, tab 21 at COE R4 21 - 0015).  Korte's July 18, 2019, revised RFP Phase 2 proposal, Tab A, states:  "The Korte Company is not proposing any deviations, exceptions or assumptions to the terms or conditions of the Solicitation for the KC-46A Fuel Maintenance Hangar at Tinker Air Force Base" (JSMF ¶ 35; R4, tab 23 at COE R4 23 - 0005).

Contract Award

23.  On September 27, 2019, the government awarded Korte Contract No. W912BV-19-C-0017 in the amount of $72,827,332.00 (JSMF ¶ 37; R4, tabs 25-26).

Government's Request for Proposal/Korte's Response

24.  By letter dated September 14, 2020, the government requested Korte submit a request for proposal (RFP-0002) to perform work identified as "Breathing Air & Chilled Water Changes" pursuant to the contract's Changes clause (JSMF ¶ 40; R4, tab 28 at COE R4 28 - 0001).  Specifically, the government requested Korte (1) "[e]xtend the existing separate breathing air system . . . past the new apron and be capped and or valved appropriately for future connections," (2) "[i]nstall new Utilities Valve Vault for 14" Chilled Water Supply (CHWS or CW) and 14" Chilled Water Return (CHWR or CW)," (3) "[i]nstall 2 - 14" Underground Chilled Water (CW) mains from the FY15 mechanical building to the new Utilities Valve Vault," and (4) "[r]emove 1 - 14" Underground Chilled Water (CW) main line. . . . Line to be removed runs from the new valve vault (NW of central plant) and extends past the new apron for future connection. RFP sheet CU101 indicated a total of 3 main lines required, but only 2- 14" mains lines are needed."  (*Id.* at COE R4 28 - 0002)

8

25.  By letter dated October 12, 2020, Korte responded to the government's request (JSMF ¶ 43).  Regarding the "Chilled Water Supply/Return & Vault," Korte (1) proposed to install new Utilities Valve Vault for 14" Chilled Water Supply and 14" Chilled Water Return, (2) stated that the "[i]nstalled vault will contain bubble-tight and air-tight manual butterfly valves," (3) stated it would "provide water/moisture blow down for the BA line and a small line of flow bypass on the west end of the new 14" Chilled Water mains in the valve box," (4) proposed to install 2 – 14" Underground Chilled Water (CW) mains from the FY15 mechanical building to the new Utilities Valve Vault, (5) proposed to remove 1 – 14" Underground Chilled Water (CW) main line, (6) stated that "[t]he line to be removed runs from the new Valve Vault NW of Central Plant and extends past the new apron for future connection, and (7) "acknowledge[d] that RFP sheet CU101 indicated a total of 3 required main lines, but only 2 – 14" main lines are needed" (R4, tab 30 at COE R4 30 - 0001-0002).  Korte did not contest that "CW" denotes "chilled water" (R4, tab 30 at COE R4 30 - 0001).

26.  By email dated November 3, 2020, the government discussed Korte's proposal for RFP-0002, noting that the proposal did not include a credit for the three 12" lines shown in the RFP drawings and stating that there should have been a credit for approximately 1,618LF of 12" chilled water line.  The government also stated that "[t]here is one vault shown at the edge of the pavement, so there should only be two additional vaults in your proposal."  (JSMF ¶ 47; R4, tab 31 at COE R4 31 - 0001-0002)

Disagreement Regarding Proposal Work

27.  By email dated November 17, 2020, Korte submitted a response to the government's November 3, 2020, email, and included as an attachment a copy of a November 6, 2020, letter to Korte from Jarrell which stated, in part, "[t]he 3 lines labeled 'CW' on drawing CU101 of the RFP were not included in the original scope/pricing.  These lines were not noted with what they were nor were any sizes indicated.  On drawing C-001 of the RFP, the abbreviations list does not show anything for 'CW'.  It does list chilled water return as 'CWR' and chilled water supply as 'CWS'."  (JSMF ¶ 48; R4, tab 33 at COE R4 33 - 0001, 0003-0004)

28.  By email dated November 18, 2020, the government responded to Korte's November 17, 2020, email, stating, in part, "we are going to need more details on why things in the RFP were not included in writing so that I can provide that to our KO.  As of now, just because it was forgotten or not added is not justification enough."  (JSMF ¶ 49; R4, tab 31 at COE R4 31 - 0003, tab 2 at COE R4 32 - 0003)

29.  By email also dated November 18, 2020, Korte responded:

I don't believe anyone is claiming to have forgotten the CW lines. There are 3 lines shown as CW with no other indication as to what they are. All other utilities have key notes and direction with the RFP writer's intent. With no direction provided our subsequent proposal did not indicate any work to take place making the assumption that they were either existing or not needed.

(*Id.*) Korte's November 18, 2020, email also states that no vaults were budgeted for the Project (*id.*).

30. By email to Korte dated December 1, 2020, the government stated, in part:

In regards to the chilled water lines, the RFP states (01 10 05.00.00 "4.4.11.6) "Extend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar. Provide connection location for future projects." The legend on C-0001 [sic] indicated that the existing chilled water line was 12" and CU101 showed the location of the chilled water lines. The legend shows 12" lines and 14" lines are needed. So a cost for increasing from 12" to 14" would be acceptable. However, since only 2 lines are required and 3 lines are shown, a credit would be due to the government for one line (deduction of a 12" line as shown). No credit was provided in your proposal for the deduction of this line. Please update the proposal accordingly.

(JSMF ¶ 50; R4, tab 31 at COE R4 31 - 0001-0002)

31. By email dated December 11, 2020, Korte responded to the government's December 1, 2020, email, stating, in part, "[w]ith regard to the chilled water line there is not clear direction in the RFP requiring us to install these [sic] line as there are for other utilities and infrastructure. The type and size you [sic] referencing for these are from other locations and other pages within the RFP and no clear direction or reference where they should be shown on CU-101. Proper direction is just simply not provided." (JSMF ¶ 51; R4, tab 31 at COE R4 31 - 0001, tab 32 at COE R4 32 - 0001)

Jarrell's Interpretation of the Solicitation Requirements

32. Included as an attachment to Korte's December 11, 2020, email was a letter dated December 8, 2020, from Jarrell Mechanical to Korte. The letter stated, in part:

10

The legend on C-001 that is being referred to is labeled as "Existing Conditions Legend". Anything listed in this legend would be referring to existing items, not new items. This legend does indeed have symbols for 12" chilled water supply and 12" chilled water return. Again, these would be referring to existing piping, not new piping. Also, none of the drawings in the RFP show this existing 12" piping. We are not understanding how a symbol for existing 12" piping implies that any new piping is also to be 12". The email also states that drawing CU-101 showed the location of the chilled water lines. In fact, CU-101 does not show any chilled water lines. The government is saying that the 3 lines labeled "CW" are chilled water lines. The legends and abbreviations on C-001 do not list a "CW", therefore how is one to know that lines labeled "CW" are chilled water?

Since the lines were not properly identified or sized on the RFP drawings, the Korte team did not include them in the project bid. Based on this, there is no credit to give for any chilled water lines or vaults.

(R4, tab 31 at COE R4 31 - 0009)

33. During his deposition, Mr. Jarrell testified that paragraph 4.4.11.6 (previously paragraph 4.5.6 (SOF ¶ 10)), was "poorly worded and unbiddable." Specifically, Mr. Jarrell testified that the provision is "poorly written . . . since there's no base wide chilled water or no base wide hot water, and we knew that at the time. We have no idea how to size the piping, even if it did exist, because we don't know the size of the future projects. And we don't know which slab edge to go to, because there's four slab edges. So I would define that as unbiddable and very poorly worded and, honestly, a leftover from the Phase One RFP before they changed it from base wide system to independent systems." (App. mot. ex., Feb. 23, 2023, M. Jarrell dep. at 33-34)

34. Regarding his actions subsequent to reading paragraph 4.4.11.6 (previously paragraph 4.5.6 (SOF ¶ 10)), Mr. Jarrell stated:

We discussed it verbally with Korte. We did research locally on the base to see -- well, first, we researched the floor plan of the base to see where the base wide chilled water and hot water system were. Determined they didn't exist. Determined the compressed air system did exist.

11

Included the compressed air system to get to the new hanger and talked verbally with Korte and included the condensed units and the hot water boilers as you pointed out in our proposal earlier.

(App. mot. ex., Feb. 23, 2023, M. Jarrell dep. at 34-35) Mr. Jarrell confirmed that these discussions took place "before the contract was awarded" (*id.* at 35). Regarding whether he took any steps to inquire from the government about this "unbiddable and very poorly worded" solicitation provision, Mr. Jarrell stated: "Questions were asked and not answered clearly. I have no idea who asked them. I don't know if Korte did that after our discussion or if somebody else asked them. (*Id.* at 35) Regarding the government's response to the March 15, 2019, question submitted by another offeror through the ProjNet system (SOF ¶ 21), Mr. Jarrell stated his belief that the response "was a poor answer," that "the RFP is vague," and that "the proposal reviewer was being lazy and not trying to figure out why the question was being asked" (app. mot. ex., Feb. 23, 2023, M. Jarrell dep. at 23:1-24:5; *see* app. mot. at 12).

Deletion of Chilled Water Lines and Unilateral Modification No. P00004

35. By letter dated February 12, 2021, the government issued RFP-0008 pursuant to the Changes clause, requesting Korte "submit a proposal for accomplishing the revised work listed as TG012, Delete Chilled Water Lines, on page 2" (JSMF ¶ 55). Page 2 of the February 12, 2021, letter, included reference to Part C, CHANGE IN CONTRACT SPECIFICATIONS, which stated:

SECTION 01 10 05.00.00 paragraph 4.4.11.6 "Extend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar. Provide connection location for future projects." shall be revised to "Extend the base wide hot water, and compressed air piping to the slab edge of the hangar. Provide connection location for future projects."

(*Id.* ¶ 57)

36. By email dated March 26, 2021, the government transmitted Modification No. P00004 to Korte for signature. The email noted that "[t]he Government requested a proposal from Korte for this action, but did not receive one." (JSMF ¶ 61; R4, tab 41) By letter dated March 31, 2021, Korte informed the government it would not execute Modification No. P0004 because "a credit is not due" (JSMF ¶ 62; R4, tab 42). On April 20, 2021, the Contracting Officer issued unilateral Modification No. P00004, decreasing the contract price by $493,639.43 (JSMF ¶ 63; R4, tab 27).

12

37.  By letter dated May 19, 2021, Korte informed the government that it did not agree that the government's issuance of unilateral Modification No. P00004 was proper and requested that the modification be deleted (JSMF ¶ 64; R4, tab 43).  The letter also referenced the March 15, 2019, question (discussed in SOF ¶ 21 above), inquiring about the reference to extending "the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar . . . ." (R4, tab 43 at COE R4 43 - 0002; *see also* JSMF ¶ 65).  Regarding that question, appellant asserts that it "was not able to send a follow up question due to the USACE response was past the Proj[N]et Question period" (*id.*).

Korte's Claim and Request for Recission of Modification

38.  By letter dated August 24, 2021, Korte submitted a request "for a final written decision of the Contracting Officer on Korte's claim that the USACE's April 21, 2021 unilateral modification adopting a credit of $493,639.43 should be rescinded" (JSMF ¶ 66; R4, tab 2 at COE R4 2 - 0001).  The letter stated, in part:

> [T]he RFP for Phase II made it clear that rather than have the fuel hangar tie into a base wide chiller system per the terms of the Phase I RFP, the fuel hangar was to have its own single air-cooled chiller and system.  Thus, the RFP for Phase II unambiguously provides that there will be no need for chilled water piping running to and from the fuel hangar.  Moreover, since there is no base wide chilled water system, terms purporting to extend such a non-existing system are obviously the product of a scrivener's mistake—one which was recognized during the development of Korte's pricing—and cannot have any force and effect.
>
> In developing Korte's pricing for the proposal dated July 18, 2019, Korte included pricing for the estimated cost to furnish and install the air-cooled chiller referenced in section 4.4.4 of the Phase II of the RFP, and to furnish and install associated piping for the hangar's system.  However, in formulating our price, neither Korte nor its mechanical and plumbing subcontractor included any costs for furnishing or installing chilled water piping beyond the fuel hangar because piping to a non-existent base wide chiller system was obviously not needed or required.
>
> As our mechanical subcontractor points out, RFP section 01 10 05.00, paragraph 4.4 describes options for

13

the cooling system. The section describes a stand-alone cooling system with either a condensing unit or a packaged air-cooled chiller. Our mechanical subcontractor utilized and relied on that information in developing its pricing. Korte, in turn, relied on that pricing from the mechanical subcontractor in providing its proposed price to the USACE.

Our mechanical contractor thereafter learned that section 010 10 05.00, paragraph 4.4.11.6 discusses extending the base chilled water to the slab edge of the hangar for future connections. Our mechanical subcontractor recognized that this must be a mistake. In this regard, a base wide chilled water system is not required for the cooling system of the Fuels Hangar. The fact that no such base wide chilled water system was contemplated as part of the present project is reinforced by the fact that the RFP provided no information on: (1) any tie in locations for any such base chilled water system; (2) where the base chilled water would be required in the future; (3) at which slab edge the base chilled water pipes should be terminated; or (4) the size or capacity of the future base chilled water needs.

(R4, tab 2 at COE R4 2 - 0001-0002)

39. Korte's claim challenged only the government's entitlement to a credit for the alleged deductive change. It did not include a challenge to the amount assessed by the government ($493,639.43) decreasing the contract price via unilateral Modification No. P00004. (*Id.*)

Contracting Officer's Final Decision

40. By letter dated October 22, 2021, the contracting officer issued a final decision denying Korte's claim that the government's "unilateral modification adopting a credit of $493,639.43 should be rescinded" (R4, tab 1 at COE R4 1 - 0001). The contracting officer noted that "Korte's claim does not request the payment of money in a sum certain, but instead appears to be requesting interpretation of contract terms or other relief arising under or relating to the Contract." The final decision stated, in part:

> It is the Government's position that the Solicitation required installation of three 12" chilled water lines.

14

However, if Korte believed there was an obvious mistake or error in the Solicitation and was aware of that at the time it prepared its proposal, as it alleges in its claim, Korte was responsible for bringing that purported patent ambiguity to the Contracting Officer's attention during the Solicitation process.

(R4, tab 1 at COE R4 1 - 0001, 0007-0008)

## DECISION

### I. Standard of Review

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003); FED. R. CIV. P. 56(a). "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in the opposing party's favor." *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998). A party challenging a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). It does not matter that the parties have cross-moved for summary judgment, both claiming that there exists no material issue of fact. *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 ("[e]ach cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other'" (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987))).

### II. Burden of Proof

This appeal involves a deductive change request, which is considered a government claim. *States Roofing Corp.*, ASBCA No. 55507, 09-1 BCA ¶ 34,094 at 168,571. The government bears the burden of establishing that the work upon which it seeks a credit was required by the contract and that it is "entitled to an equitable adjustment for a deductive change to reflect the cost savings to the contractor." *C.H. Hyperbarics, Inc.*, ASBCA No. 49375 *et al.*, 04-1 BCA ¶ 32,568 at 161,150; *see Fru-Con Const. Corp.*, ASBCA Nos. 53544, 53794 05-1 BCA ¶ 32,936 at 163,165 ("The requirement that a contractor claimant must shoulder the burden of establishing the fundamental facts of liability, causation and resultant injury relating to a claim for which it sees [sic] recovery applies with equal efficacy to claims brought by the government"). The government likewise has "the burden of proof as to

15

the amount of the credit to which it is entitled for the deductive change." *States Roofing*, 09-1 BCA ¶ 34,094 at 167,573 (citing *Nager Elec. Co. v. United States*, 194 Ct. Cl. 835, 853, 442 F.2d 936, 946 (1971)).

III. Contentions of the Parties

The government seeks a deductive change for certain work deleted from the contract. The parties disagree as to whether the deleted work was, in fact, a requirement of the contract. According to the government, the plain language of the contract, when read as a whole, unambiguously required installation of three chilled water lines. The government labels as unreasonable Korte's interpretation of the contract that the water lines were not required. (Gov't mot. at 23) The government argues in the alternative that Korte's pre-award interpretation of the contract regarding the water lines created a patent ambiguity in the contract, giving rise to a duty to inquire, which appellant failed to carry out (*id.*). The government states that it relied upon an independent government estimate to determine the amount of the credit and that "Korte has not questioned the amount of the credit and does not dispute the Government's estimated value of the cost of removing the requirement to install in the three lines" (gov't mot. at 29).[3]

Korte maintains that the contract did not require installation of the three water lines (app. mot. at 1). According to appellant, the government is not entitled to a credit for the deductive change because appellant, through its mechanical subcontractor, read/understood the contract prior to award as not requiring installation of chilled water lines and appellant thereby did not include in its proposal any costs for such work (app. resp. at 53-54). Korte states that, because it did not include the cost of installing chilled water lines in its proposal, there are no costs to be deducted from the contract or reimbursed to the government (*id.* at 55). Korte also argues that its interpretation is reasonable, and that the government's contrary interpretation is unreasonable (app. mot. at 25; app. resp. at 25).

IV. The Interpretation of Korte's Mechanical Subcontractor Pre-Award Created an Ambiguity Regarding Work the Contractor was Required to Perform

A contract "is ambiguous if it is susceptible of more than one reasonable interpretation. It is patently ambiguous if the ambiguity should be apparent to a reasonable person in the claimant's position." *Dick Pacific/GHEMM, JV*, ASBCA No. 55806, 07-2 BCA ¶ 33,711 at 166,903. "If there is a patent ambiguity, inconsistency or mistake, the contractor must inquire about it prior to submitting its

---

[3] Our review of Korte's ASBCA filings uncovered no instance wherein Korte disputed the government estimate or questioned the government's credit amount.

16

bid or proposal." *Id.* The origin of this doctrine resides "in the policy of ensuring that two negotiating parties (whether private or governmental) do what they are able to do to clear up patent ambiguities or defects before formation, thus helping to reduce future litigation and allowing expeditious contract formation." *Boeing Co. v. United States*, 968 F.3d 1371, 1380 (Fed. Cir. 2020).

The doctrine of contra proferentem does not apply where the contractor knew of the alleged ambiguity before submitting its bid. *James A. Mann, Inc. v. United States*, 210 Ct. Cl. 104, 122, 535 F.2d 51, 61 (1976) (the degree to which an ambiguity was "patently obvious" or "not glaring" is irrelevant where the contractor was aware of the ambiguity prior to submitting its bid); *Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1361-62 (Fed. Cir. 2018) (contractor asserting breach of contract claim who alleges that documents were ambiguous on their face had a duty to seek clarification of any such patent ambiguity before submitting its offer or bid and cannot rely upon that discrepancy as a basis for a subsequent claim); *Edward L. Kolbar Co.*, ASBCA No. 15520, 73-2 BCA ¶ 10,063 at 47,201 (subcontractor knowledge of ambiguity when bidding placed upon it the burden of inquiry).

There is no legitimate dispute that the RFP Phase 2 documents included reference to chilled water piping, i.e., contract drawings with three parallel lines running east to west labeled "CW" (SOF ¶¶ 13, 22). Although, as Korte notes, the drawings did not include a definition of "CW" (SOF ¶ 11) or include reference to chilled water in the drawing containing a "Civil Legend" (SOF ¶ 15), other drawings defined similar terms, including "CWR" (Chilled Water Return) and CWS (Chilled Water Supply) (SOF ¶ 14). Moreover, it is undisputed the RFP Phase 2 specification included a new paragraph 4.5.6, which required the contractor to "[e]xtend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar. Provide connection location for future projects." (SOF ¶ 10) In addition to raising issues regarding which side of the slab edge the pipes were to be extended and, later, how wide the pipes were required to be (SOF ¶¶ 10, 32), appellant argues now that "[t]here was simply no good reason to extend chilled water piping from the slab edge of the hangar per the above-quoted SOW . . . when there was no apparent need for chilled water piping in the first place" and "**it was absurd to read the SOW statement as extending something that was non-existent**" (emphasis in original) (app. mot. at 27). Korte's chosen course of action - to simply ignore the import of the actual language that Korte viewed as "absurd" - in no way justifies Korte's decision to make no inquiry regarding the meaning of the new specification paragraph 4.5.6, or the government's reference in that specification to "future projects."

The record establishes that Korte's subcontractor recognized pre-award an ambiguity in the solicitation documents regarding installation of chilled water lines, although rather than seeing a relatively limited set of ambiguities, chose (and, let there be no mistake, it was a choice) to interpret the contract to its benefit (SOF ¶¶ 6, 32-34,

17

38; app. resp. at 9; app. reply at 21). Specifically, Korte states that "[d]uring the Project solicitation stage, Jarrell Mechanical's project team interpreted the solicitation documents including the concept drawings as not calling for any chilled water improvements" (SOF ¶ 6). Korte also asserts that "[t]he determination of the scope of mechanical improvements belonged to the party responsible for mechanical engineering, namely Jarrell Mechanical," and that "Jarrell Mechanical reviewed the solicitation documents and concluded that chilled water improvements were not required" (app. reply at 9-10) (citing app. resp. at 53-54).

Appellant's August 24, 2021, claim likewise admits knowledge of the ambiguity discovered during development of Korte's pricing, stating, "since there is no base wide chilled water system, terms purporting to extend such a non-existing system are obviously the product of a scrivener's mistake—one which was recognized during the development of Korte's pricing—and cannot have any force and effect" (SOF ¶ 38). However, appellant's suggestion that the solicitation's reference to a base-wide chilled water system was simply a "scriveners mistake" ignores the fact that the referenced specification clause – which Korte labels as "purporting to extend such a non-existing system" – was not a remanent of the RFP Phase 1, as Korte suggests, but was *added* to the solicitation with the issuance of RFP Phase 2, as new specification paragraph 4.5.6 (later paragraph 4.4.11.6) (SOF ¶ 10), along with changes to paragraph 4.4.4, "Air cooled chiller" (SOF ¶ 9).[4]

During his deposition, Mr. Jarrell stated that paragraph 4.4.11.6 was "a leftover from the Phase One RFP before they changed it from base wide system to independent systems" (SOF ¶ 33). Inasmuch as paragraph 4.5.6 (later paragraph 4.4.11.6) was not included in RFP Phase 1 and was added with RFP Phase 2 (SOF ¶ 10), it is not properly characterized as a "leftover," having been added to the solicitation requirements with issuance of RFP Phase 2 (SOF ¶ 9). Moreover, appellant's attempt to justify ignoring this provision by labeling it as a scrivener's error violates the well-established rule that "[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc., v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted).

---

[4] RFP Phase 2 deleted the following statement (as it appeared in RFP Phase 1) "Air cooled chiller: The Tinker Air Force Base existing chilled water loop will be utilized to provide cooling to the facility" (*see* SOF ¶ 4) and replaced it with "Air cooled chiller: A single air-cooled chiller may be provided" (SOF ¶ 9). New paragraph 4.5.6 stated that that the contractor should "[e]xtend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar," and "[p]rovide connection location for future projects" (SOF ¶ 10).

During his deposition, Mr. Jarrell also testified about internal discussions that took place "before the contract was awarded" (SOF ¶ 33). Mr. Jarrell stated that specification paragraph 4.4.11.6 was "poorly worded and unbiddable" (*id.*). Specifically, Mr. Jarrell stated that the provision is "poorly written . . . since there's no base wide chilled water or no base wide hot water, and we knew that at the time. We have no idea how to size the piping, even if it did exist, because we don't know the size of the future projects. And we don't know which slab edge to go to, because there's four slab edges. So I would define that as unbiddable and very poorly worded." (*Id.*) Mr. Jarrell's conclusion that the solicitation provision was "unbiddable" was reason enough for appellant to seek clarification from the government. *See Santa Fe Eng'rs, Inc.*, ASBCA No. 23523, 92-1 BCA ¶ 24,420 at 121,901 (appellant who considered reference in contract drawing to be "'un-biddable' at bid time and did not bid anything for [the work]" had an affirmative obligation to raise the issue with the government prior to submitting its bid); *Newsom v. United States*, 230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (1982) ("The existence of a patent ambiguity in itself raises the duty of inquiry, regardless of the reasonableness vel non of the contractor's interpretation. . . . The court may not consider the reasonableness of the contractor's interpretation, if at all, until it has determined that a patent ambiguity did not exist").

"A subcontractor's interpretation will be imputed to a contractor if the contractor proves that the subcontractor relied upon the interpretation in its bid to the contractor, and that the contractor incorporated the subcontractor's bid or the subcontractor's price was comparable to that of others and the contractor's bid reflected those estimates." *M.A. Mortenson Co.*, ASBCA No. 53146 *et al.*, 05-1 BCA ¶ 32,846 at 162,771; *Caddell Constr. Co., Inc.*, ASBCA No. 35368, 90-1 BCA ¶ 22,263 at 111,846 (pre-award knowledge and understanding of subcontractor who provided input for certain contract work imputed to appellant where record contained no evidence indicating appellant's pre-award understanding regarding that work); *S/G Constr., Inc.*, ASBCA No. 38477, 89-3 BCA ¶ 22,234 at 111,781 (pre-award knowledge and understanding of subcontractor who provided bid input for a portion of work imputed to appellant). Korte's readily admits that its cost estimate relied upon Jarrell Mechanical's determination of the required work as set forth in the solicitation (SOF ¶ 38; app. resp. at 54) and "that both Korte and Jarrell Mechanical construed the drawings and the specifications during the solicitation period as not calling for any chilled water improvements" (app. reply at 21).[5]

---

[5] The government argues that appellant "has not demonstrated that it relied on Jarrell's interpretation before award rather than during performance," and that "Korte is inconsistent on when it interpreted whether the chilled water lines were a contract requirement" (gov't reply at 20). However, for the purpose of deciding the parties' motions for summary judgment, we consider appellant's statements to be judicial admissions regarding the issue of Korte's knowledge of the ambiguity created by Jarrell's interpretation of the solicitation. *See Raytheon*

Korte cites *WPC Enters., Inc. v. United States*, 163 Ct. Cl. 1, 5-6, 323 F.2d 874, 876-77 (1963), for the proposition that "any claimed ambiguity or claimed discrepancy about whether Korte's scope of work encompassed three chilled water lines and a pipe vault cannot be viewed objectively as an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap" (app. mot. at 33). *WPC* addresses the situation where both the government and the contractor proffer reasonable interpretations of a contract and, in the absence of an obvious error or glaring error, the contract is interpreted against the government as drafter. That is not the situation here, as Korte's own interpretation of the contract recognized the patent ambiguity. Indeed, appellant's argument in its motion for summary judgment that the ambiguity "cannot be viewed objectively as an obvious error in drafting," contradicts the statement in Korte's claim that the "terms purporting to extend such a non-existing system are obviously the product of a scrivener's mistake—one which was recognized during the development of Korte's pricing" (SOF ¶ 38).

In its responsive brief, appellant admits that this appeal "represents one of those atypical, if not rare, instances where the scrivener included words that, considering the circumstances, are impossible of performance and cannot be given any sensible meaning in the context of this project," labeling the reference to "chilled water" in paragraph 4.5.6 as "plainly superfluous" (app. resp. at 42). Viewed objectively, appellant was not, therefore, free to simply ignore the specification provision it considered superfluous. *Santa Fe Eng'rs, Inc.*, ASBCA Nos. 22090, 22194, 79-1 BCA ¶ 13,647 at 66,967 ("A basic tenet of contract interpretation is that every effort must be made to give meaning to each provision and not to accept an interpretation which will render any part of the contract meaningless, inexplicable or render it useless or superfluous. These factors should have caused appellant to question the reasonableness of its interpretation and to have sought clarification from the contracting officer").

In an attempt to downplay the import of the reference to "CW" on certain contract drawings (SOF ¶¶ 12, 22), Korte states that the letters "CW" "are smaller than the other lettering on the plan sheet and are not readily discernable when viewing the pdf of that plan sheet on the computer in the normal '100%' size text mode" (app. mot. at 5; *see also* app. mot. at 25 ("CW" lettering is "difficult to read in normal computer mode")). Even assuming that the reference to "CW" appears smaller than other markings and thereby more difficult to read, this does not excuse appellant from

*Co.*, ASBCA No. 57743 *et al.*, 16-1 BCA ¶ 36,335 at 177,147 (distinguishing between judicial admissions and evidentiary admissions). Put another way, Korte's assertions regarding its reliance upon Jarell's interpretation were contrary to its own interests and we will consider them here in ruling against Korte.

attempting to understand its import, nor does it somehow cast the information as less important or less relevant than other, larger markings or information set forth on the drawings. *See Natkin and Co.*, ASBCA Nos. 26072, 29071 84-2 BCA ¶ 17,469 at 87,044 (where contract drawings are "difficult to read" it is incumbent upon the contractor to resolve "the matter by inquiry prior to submitting its proposal").

In *Ghemm-Manson-Osberg*, ASBCA No. 16217, 71-2 BCA ¶ 9,136 at 42,364, we held that, even assuming the contract was ambiguous and that both parties' interpretations were reasonable, the contractor could not prevail because the record established that the contractor's subcontractor recognized an ambiguity. We stated, "[t]he ambiguity, if we were to consider the contract terms ambiguous, was not the result of a subtle lack of clarity in specifying the desired performance but was patent and glaring to appellant's subcontractor and was or should have been obvious to appellant itself." The same is true here. We find there is no genuine issue of material fact regarding appellant's and its subcontractor's interpretation of the solicitation as containing an ambiguity, of which appellant and its subcontractor admittedly were aware prior to award, and that appellant has not presented sufficient evidence upon which a reasonable factfinder could find that appellant's or its subcontractor's interpretation of the solicitation did not create an ambiguity.

V. Korte and its Subcontractor Failed to Inquire from the Government About the Ambiguity Pre-Award

A patent ambiguity "triggers a duty to inquire." *NVT Techs.*, 370 F.3d at 1162. Although the duty to seek clarification of patent ambiguities or defects does not require the contractor to "ferret out hidden or subtle errors in the specifications," *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1085 (Fed. Cir. 2002), the ambiguity here required no ferreting out of hidden or subtle specification errors. As we discuss below, uncontroverted record evidence establishes that, at bottom, Korte, through its mechanical subcontractor Jarrell, was aware of the ambiguity or defect in the contract documents and chose to interpret it without consultation from the government. *See Dynamic Sys. Tech., Inc.*, ASBCA No. 63037, 23-1 BCA ¶ 38,274 at 185,863 (contractor assumed the risk "[b]y submitting a proposal based upon information it considered to be erroneous, and by failing to take avenues available to it to challenge the solicitation language prior to submitting its proposal").

A. Neither Appellant Nor its Subcontractor Made an Inquiry to the Government

Where a contractor has knowledge of an ambiguity in the contract, it "imposes upon it *a duty to inquire of the government*," which "tends to deter a bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid (based on the less costly reading) with the

21

expectation that he will then be able to cry 'change' or 'extra' if the procuring officials take the other view after the contract is made." *Lebolo-Watts Constructors 01 JV, LLC*, ASBCA No. 59740 *et. al*., 21-1 BCA ¶ 37,789 at 183,433 (emphasis added) (quoting *S.O.G. of Ark. v. United States*, 212 Ct. Cl. 125, 131, 546 F.2d 367, 371 (1976). That the inquiry must be made to the government makes sense, as the requirement "that a contractor, before bidding, should attempt to have the Government resolve a patent ambiguity in the contract's terms is a major device of preventive hygiene; it is designed to avoid just such post-award disputes as this by encouraging contractors to seek clarification before anyone is legally bound." *S.O.G. of Ark.*, 212 Ct. Cl. at 131, 546 F.2d at 370-71.

Korte offers no evidence that it made any inquiry regarding the import of specification paragraph 4.5.6 (later paragraph 4.4.11.6) (SOF ¶ 10). It alleges instead that Mr. Jarrell "made the inquiry" (app. resp. at 43). According to Korte, Mr. Jarrell conducted an "investigation of pre-existing utility lines at Tinker AFB," and "confirmed via available base documents that no base-wide or campus chilled water system or hot water existed . . . ." (*id.*). Mr. Jarrell's "investigation" examining "available base documents" does not equate to making an inquiry of *the government* about the contract requirements given Mr. Jarrell's interpretation of specification 4.5.6.

Regarding Mr. Jarrell's actions upon reading paragraph 4.5.6, Mr. Jarrell stated:

> We discussed it verbally with Korte. We did research locally on the base to see -- well, first, we researched the floor plan of the base to see where the base wide chilled water and hot water system were. Determined they didn't exist. Determined the compressed air system did exist. Included the compressed air system to get to the new hanger and talked verbally with Korte and included the condensed units and the hot water boilers as you pointed out in our proposal earlier.

(SOF ¶ 34) Mr. Jarrell's conversations with Korte likewise do not equate to making an inquiry from the government. On the issue of whether Mr. Jarrell took any steps to inquire from the government about what he termed an "unbiddable and very poorly worded" solicitation provision (SOF ¶ 34), Mr. Jarrell stated "[q]uestions were asked and not answered clearly. I have no idea who asked them. I don't know if Korte did that after our discussion or if somebody else asked them." (*Id.*) Mr. Jarrell's statements on this issue are not evidence upon which a reasonable factfinder could find that appellant or its subcontractor raised the issue with the government, and appellant offers no other evidence to support a finding that it raised the issue with the government.

22

Appellant's failure to inquire is compounded by the solicitation's inclusion of FAR 52.236-21, which, in case of discrepancies in the drawings or specifications, requires the contractor to promptly notify the contracting officer in writing and that "[a]ny adjustment by the Contractor without such a determination shall be at its own risk and expense" (SOF ¶ 16).[6] Likewise, paragraph 3.8 of the specifications warned Korte that should it "have any questions related to specific terms and conditions, these must be resolved prior to submission of the offer," and that any deviations or exceptions included in an offer shall be listed and described in detail in the deviations in TAB A (SOF ¶ 3). Both of Korte's Phase 2 technical proposals (original and revised) stated in TAB A that "[t]he Korte Company is not proposing any deviations, exceptions or assumptions to the terms or conditions of the Solicitation for the KC-46A Fuel Maintenance Hangar at Tinker Air Force Base" (SOF ¶ 22).

Korte argues that paragraph 4.4.11.6 suggests the existence of what it terms a "patent discrepancy," stating "Jarrell Mechanical decided to investigate, after reading the 'extend' clause, to confirm there was no base wide chilled water" (app. reply at 22 (citing app. resp. at 8 n.31)). Appellant alleges "[a]s to that patent discrepancy (i.e., an impossibility), the duty to investigate was met," and "[a]s for the three 'no keynote' lines on Drawing CU101, Jarrell Mechanical properly interpreted them as not calling for any improvements because the keynote/keynote designation protocol was followed as to those three lines" (*id.*).[7] Appellant then concludes, stating "[t]hose three "no keynote" lines did not constitute a patent ambiguity" (*id.*). We disagree. Whether termed a "patent discrepancy" or a "patent ambiguity," Korte offers no evidence that it made any inquiry from the government about its subcontractor's interpretation of the solicitation. Mr. Jarrell's "investigation" likewise does not constitute making such an inquiry. We find that Korte has not presented sufficient evidence upon which a reasonable factfinder could find that appellant (or its subcontractor) properly inquired from the government about the ambiguity in the solicitation identified by its subcontractor prior to contract award.

---

[6] We note also that the order of precedence clause here provides that in the event there is a difference between the drawings and the specifications, the specifications shall govern (SOF ¶ 16). Here, the provision requiring the contractor to "[e]xtend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar," and "[p]rovide connection location for future projects" is set forth in the RFP Phase 2 specifications (SOF ¶ 10). Accordingly, any argument that appellant could ignore the import of that specification provision in the context of determining the contract requirements is misplaced.

[7] In its December 8, 2020, letter, Jarrell Mechanical likewise suggests that "[s]ince the lines [labeled 'CW'] were not properly identified or sized on the RFP drawings, the Korte team did not include them in the project bid (SOF ¶ 32).

B. <u>Submissions by Other Offerors Through the ProjNet System Do Not Satisfy Appellant's Duty to Inquire</u>

Korte also suggests that its duty to inquire was satisfied by other offerors who submitted Requests for Information (RFI) through the ProjNet system (app. resp. at 51-52). One such RFI noted the solicitation requirement that the contractor "[e]xtend the base wide chilled water, hot water, and compressed air piping to the slab edge of the hangar," and inquired "[a]re we required to extend CHW [chilled water] and HW [hot water] to the hangar if we are not utilizing either service for this facility?" (SOF ¶ 21) To which the government responded "[e]xtend the base wide systems per the RFP" (*id.*). Appellant labels the government's response "unhelpful," stating that it "clarifies nothing and reflects an unwillingness to provide to the offerors a better understanding of what USACE desired in terms of the systems referenced in the SOW" (app. resp. at 52).

Appellant's argument that the government's response was "unhelpful" and "clarifies nothing" is of no moment. It is beyond cavil that "when an offeror attempts, but the government's response fails, to resolve an ambiguous solicitation provision, the offeror has the duty to continue to seek to resolve that ambiguity." *Phoenix Mgmt., Inc.*, ASBCA No. 57234, 11-1 BCA ¶ 34,734 at 171,005 (citing *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1580 (Fed. Cir. 1993) (it is not enough under the duty to inquire that a contractor merely make an initial inquiry); *Beacon Constr. Co. of Mass. v. United States*, 161 Ct. Cl. 1, 6-7, 314 F.2d 501, 504 (1963) (offeror has a duty to "call attention to an obvious omission in specification, and make certain that the omission was deliberate"); *General Dynamics - National Steel and Shipbuilding Co.*, ASBCA No. 61524, 22-1 BCA ¶ 38,067 at 184,824 ("if the government's response to that initial inquiry fails to address and resolve the ambiguity, the contractor is obligated to request further clarification"). The reason for this requirement to seek further clarification of such ambiguities is "to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact." *Community Heating*, 987 F.2d at 1580.

Korte cites two additional RFIs that touch on the issue of heating and cooling systems (app. resp. at 51-52) (SOF ¶¶ 18-19). However, we find that these RFIs do not address specifically the expressed understanding of appellant's subcontractor regarding the existence a base-wide chilled water system or the requirement to install or extend chilled water lines (nor does appellant claim to be one of the offerors who submitted any of the RFIs). Indeed, these RFIs cited by appellant assume the existence of an existing or base wide chilled water system (SOF ¶¶ 18-19; *see also* SOF ¶ 21).

24

Korte argues that "any further inquiry on that topic would have been futile" (app. resp. at 53) (although appellant offers no evidence that it made *any such inquiry*, relying instead on RFIs submitted by other offerors). As support for its argument, Korte cites the Court of Federal Claims' decision in *Allied Tech. Grp., Inc., v. United States*, 39 Fed. Cl. 125 (1997).[8] In that case, the plaintiff and one other contractor submitted questions to the government that directly addressed the ambiguity presented in the solicitation and the government responded both times that "[t]he solicitation is clear on its face." *Id.* at 141. The court held that the government could not rely upon the doctrine of patent ambiguity, stating "[o]nce ambiguities have been identified, in this case by the plaintiff, and clarification has been genuinely sought, the inconsistencies must be interpreted against the . . . drafter. *Id.* at 142. That simply is not the situation presented in this appeal. Aside from the non-binding nature of that decision on this Board, appellant has presented no evidence that there was any inquiry of the government regarding appellant's subcontractor's specific interpretation of the solicitation requirements prior to contract award. Moreover, as discussed above, decisions of this tribunal make clear that an offeror has the obligation to continue to pursue issues such as this where the government's response fails to address the issue presented.

We note that one additional RFI cited by appellant in its opening brief inquired about "relocation of the campus chilled and hot water pipes," stating that "[t]he civil plans do not show any existing campus chilled or hot water," and asking "[c]an drawings of the existing pipes be provided?" (SOF ¶ 17). To which the government responded, "[t]he CHWS and CHWR lines shown are per the FY 15 Support Infrastructure project and show the lines routed north in order to avoid the Fuel Hangar footprint," and instructed that "[t]he awarded-Contractor must confirm this is the case prior to design and construction" (*id.*). Appellant fails to discuss the import of this RFI, or whether its subcontractor even considered the government's response regarding the CHWS or CHWR lines as depicted on the FY 15 Support Infrastructure project.[9]

---

[8] We note that decisions of the Court of Federal Claims, are "neither binding upon this tribunal, nor are they even binding in other matters pending before the Court of Federal Claims." *Northrop Grumman Corp.*, ASBCA No. 62165, 21-1 BCA ¶ 37,922 at 184,180 n.8) (citing *C.R. Pittman Constr. Co., Inc.*, ASBCA No. 57387 *et al.*, 15-1 BCA ¶ 35,881 at 175,427 n.6 (Court of Federal Claims decisions are not binding precedent for the ASBCA); *Zaccari v. United States*, 142 Fed. Cl. 456, 462 n.6 (2019) ("Decisions of the United States Court of Federal Claims do not bind the court in this matter but may provide persuasive authority").

[9] Although Korte included this RFI question and response in the "Facts" portion of its opening brief (app. mot. at 10-11) and made passing reference to the RFI in its

Korte cites *Caraco Constr. Co*., ASBCA Nos. 28431, 32408, 86-3 BCA ¶ 19,245 at 97,326, for the proposition that "when the particular subject in the RFP is ambiguous, and that matter is brought to the government's attention, the curt reply to simply follow what the RFP requires is 'unhelpful'" (app. mot. at 34). In that appeal, however, the Board found that appellant's president questioned the government about the specific ambiguity that was the basis of its claim and the government promised to arrange a meeting between appellant and the Chief of Engineering and Environmental Planning to discuss appellant's concern. However, that appointment never took place and ultimately appellant was told to bid the item at issue as set forth in the drawings and specifications. *Id.* at 97,324. The Board noted also that both the government engineer who developed the specifications and drawings, and the former Chief of Engineering and Environmental Planning who signed the contract drawing at issue, agreed with the interpretation proffered by appellant. *Id.* at 97,326. Here, Korte offers no evidence that it specifically inquired from the government about its subcontractor's interpretation of the solicitation, or its conclusions as to what work was required (or that a meeting to discuss the issue with government representatives was promised but never arranged).[10] What is certain, however, is that the RFIs cited by appellant neither addressed nor responded to the specific interpretation of the solicitation proffered by appellant's subcontractor. We find that appellant has not presented sufficient evidence upon which a reasonable factfinder could find that RFIs submitted by other offerors addressed the specific ambiguity identified by appellant's subcontractor or otherwise satisfied *appellant's* duty to inquire.

VI.    Whether Appellant Included in its Pricing the Cost of Installing Chilled Water Lines is not Controlling to the Outcome of this Appeal

There is some facial appeal to appellant's argument that the government is not entitled to a credit for deletion of work regarding the chilled water lines requirement because, according to appellant, its price did not include the cost of installing those lines. *See Norcoast-Beck Aleutian, A Joint Venture*, ASBCA No. 25469, 81-1 BCA ¶ 15,072 at 74,550 ("the salient criterion of liability for a deductive change is whether the change causes a 'decrease in the Contractor's cost of . . . performance of any part of the work,' and the fact that the Government incurs no expense or damages because of the change is irrelevant to the issue"). However, this Board long ago expressly

---

reply brief (app. reply at 13), Korte offered no specific discussion or analysis of the RFI itself.

[10] Regarding the March 15, 2019, RFI discussed above (SOF ¶ 21), Korte's May 19, 2021, letter to the government states that appellant "was not able to send a follow up question due to the USACE response was past the Proj[N]et Question period" (SOF ¶ 37). However, this does not excuse appellant's failure to timely raise the issue in the first instance.

26

rejected such an argument that "since appellant did not include the costs for the disputed items in its bid, the Government has already received the savings from the use of the less costly course of performance; therefore to permit a downward adjustment would penalize appellant for being competitive and reward the Government with a windfall." *G & C Enters., Inc.*, ASBCA No. 36618, 89-2 BCA ¶ 21,609 at 108,785-86. In *Bruce Anderson Co., Inc.*, ASBCA No., ASBCA No. 29412, 32247, 89-2 BCA ¶ 21,872 at 110,037-38, citing *G & C Enters.*, we expanded upon the reasoning for such a holding, stating "[w]e are not unmindful of the equity considerations which seem to flow from situations such as this. If one simply is swayed by the plea that nothing was included in the bid to cover the work so that it is inequitable to demand a return of money, one loses sight of several cogent factors." *Id.* at 110,037. One such factor is protection of "[t]he competitive bidding system," for which we noted, "[a]ny bidder who omits, for any reason, costs that would otherwise be included, gets the benefit of a bid lower than it otherwise would be, but runs the risk of a later change in contract price. Such a bidder's trade-off for the risks involved is the greater likelihood of contract award." *Id.* at 110,038 (quoting *Hof Constr., Inc.*, GSBCA No. 7027, 84-3 BCA ¶ 17,571 at 78,563 (dissenting opinion)).

Our holding is consistent with the Court of Appeals for the Federal Circuit decision in *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997), which recognized that the purpose of the court-made rule of patent ambiguity, "is designed to ensure, to the greatest extent possible, that all parties bidding on a contract share a common understanding of the scope of the project." As noted by the Federal Circuit, this "objective is particularly important in government contracts, in which significant post-award modifications are limited by the government's obligation to use competitive bidding procedures and by the risk of prejudice to other potential contractors." *Id.*

<u>CONCLUSION</u>

Given our findings herein, we need not address the remaining arguments offered by the parties regarding the plain language of the contract or the reasonableness of the parties' respective interpretations of the contract requirements. The government's motion for summary judgment is granted, and appellant's motion for summary judgment is denied. The appeal is denied.

Dated: October 26, 2023

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63148, Appeal of Korte Construction Company, rendered in conformance with the Board's Charter.

Dated: October 27, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals